# United States Court of Appeals
## For the First Circuit

No. 05-1605

DANIELLE HARLOW,

Plaintiff, Appellant,

v.

CHILDREN'S HOSPITAL,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Lynch, Circuit Judge,
Campbell and Stahl, Senior Circuit Judges.

Adam A. Rowe, with whom Leo J. Dunn, III and Crowe & Dunn were on brief, for appellant.
James B. Haddow, with whom Bradford A. Pattershall and Petruccelli, Martin & Haddow, LLP were on brief, for appellee.

December 20, 2005

**LYNCH**, <u>Circuit Judge</u>.  In November 2004, Danielle Harlow of Turner, Maine, sued Children's Hospital of Boston, Massachusetts, in the Maine Superior Court for medical malpractice during a procedure performed at the Hospital on May 10, 1993. Danielle was six years old at the time of the procedure.  The issues addressed here would never have arisen had she filed suit in Massachusetts courts, which had jurisdiction over the Hospital, before the expiration of the Massachusetts three-year statute of limitations.  <u>See</u> Mass. Gen. Laws ch. 231, § 60D.  She did not file such a suit.

Rather, Harlow instituted proceedings in Maine after the Massachusetts statute had expired.  Maine allows minors to commence an action "within 6 years after the cause of action accrues or within 3 years after the minor reaches the age of majority, whichever first occurs."  Me. Rev. Stat. Ann. tit. 24, § 2902.  The November 2004 suit was timely filed under Maine law because Harlow had filed a Notice of Claim before the six years had expired, thereby tolling the statute of limitations.  <u>See</u> <u>id.</u> § 2859.  The question is whether an exercise of personal jurisdiction over the Hospital in Maine would comport with Maine's long-arm statute and the Due Process Clause.

The Hospital removed the Maine case to federal court, invoking diversity jurisdiction.  The Hospital then moved to dismiss the case for lack of personal jurisdiction.  The court

granted that motion, and Harlow appeals. We affirm. In doing so, we clarify the time frame of the evidence to which a court may look in deciding whether a defendant's contacts with a state are sufficient to justify personal jurisdiction, both specific and general.

## I.

In 1993, Danielle Harlow underwent a radiofrequency cardiac ablation procedure at the Hospital in Boston. The procedure was performed to treat Harlow's supraventricular tachyarrhythmia, a condition secondary to Harlow's Wolff-Parkinson-White syndrome. Allegedly as a result of the Hospital's negligence, Harlow suffered a stroke during the procedure. Harlow alleges that the stroke caused brain damage, with the result that she suffers serious permanent injury in the form of severe left hemiparesis,[1] as well as cognitive and behavioral impairments, including "cognitive deficits, personality changes, attention and concentration deficits, impulsivity, and an inability to modulate her behavior."

In May 1999, Harlow filed a notice of medical malpractice claim against the Hospital and four affiliated doctors, initiating

---

[1] Hemiparesis is "muscular weakness or partial paralysis restricted to one side of the body," according to Webster's Third New International Dictionary 1054 (1993). Harlow says that she suffers from a deformity in her left hand and from impaired gait and balance. In particular, according to a doctor who evaluated Harlow, Harlow has a "claw hand" on the left side and her left foot turns inward as she walks.

mandatory prelitigation screening panel proceedings, as required by Maine law. See Me. Rev. Stat. Ann. tit. 24, §§ 2853, 2903. The defendants asserted lack of personal jurisdiction over them in Maine; the panel chair, acting on a joint motion of the parties, referred the issue of jurisdiction to the Maine Superior Court pursuant to Me. Rev. Stat. Ann. tit. 24, § 2853(5). In February 2001, after briefing, the Superior Court granted the defendant doctors' motion to dismiss for lack of personal jurisdiction, but denied the Hospital's motion, ruling that there was personal jurisdiction over the Hospital (the court did not specify whether it was relying on general or specific jurisdiction, and it cited factors pertinent to both).

In October 2004, the screening panel unanimously decided that the Hospital's treatment of Harlow had deviated from the applicable standard of care and had caused her injury. In November 2004, Harlow filed her medical malpractice complaint in Maine Superior Court. The Hospital removed the case to federal court and moved to dismiss for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2). Harlow filed an objection on the merits and under the law of the case doctrine, and the Hospital filed a reply.

In March 2005, the district court granted the Hospital's motion to dismiss. The court observed that to the extent the "law of the case" doctrine applied at all, it is "a matter of discretion," and that it was preferable to resolve the issue. The

court, sitting in diversity, held that it lacked personal jurisdiction, both specific and general, over the Hospital.

On appeal, Harlow argues that the district court erred in two ways: first, the law of the case doctrine precluded the Hospital from relitigating the issue of personal jurisdiction, and second, on the merits, Harlow had established personal jurisdiction over the Hospital.

## II.

**A.      Law of the Case**

"[L]aw of the case is an amorphous concept. As most commonly defined, the doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case. Law of the case directs a court's discretion, it does not limit the tribunal's power." Arizona v. California, 460 U.S. 605, 618 (1983) (citation and footnote omitted). "Under law of the case doctrine, as now most commonly understood, it is not improper for a court to depart from a prior holding if convinced that it is clearly erroneous and would work a manifest injustice." Id. at 618 n.8.

Whether the law of the case doctrine applies at all is a question of law, which we review de novo. See Tang v. Dep't of Elderly Affairs, 163 F.3d 7, 10-11 (1st Cir. 1998). Strictly speaking, the law of the case doctrine -- understood as a bar to subsequent review -- was not implicated in this case, because

-5-

"[i]nterlocutory orders, including denials of motions to dismiss, remain open to trial court reconsideration, and do not constitute the law of the case." Perez-Ruiz v. Crespo-Guillen, 25 F.3d 40, 42 (1st Cir. 1994). Thus, the district court was free to reconsider the earlier interlocutory order.

We have sometimes said -- instead of an outright statement that law of the case is not applicable to interlocutory orders at all -- that law of the case permits a lower court to review prior interlocutory orders as long as that review is not an abuse of discretion. Were the law of the case doctrine even to apply, then, we would review only for abuse of discretion. See Geffon v. Micrion Corp., 249 F.3d 29, 38 (1st Cir. 2001) (reviewing a district court's reconsideration of its own prior ruling on summary judgment motion for abuse of discretion); see also In re Cabletron Sys., 311 F.3d 11, 21 n.2 (1st Cir. 2002) ("The law of the case is a discretionary doctrine, especially as applied to interlocutory orders such as this one. As Justice Holmes expressed it, '[T]he phrase, law of the case, as applied to the effect of previous orders on the later action of the court rendering them in the same case, merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power.'" (citation omitted) (alteration in original) (quoting Messenger v. Anderson, 225 U.S. 436, 444 (1912))). As one commentator has said, the law of the case doctrine involves an

"effusion of applications," some of which are more discretionary than others. 18B Wright, Miller, & Cooper, Federal Practice and Procedure § 4478, at 637 (2d ed. 2002).[2] Regardless of phrasing, the result here is clear. The district court was not barred from reconsidering the prior decision; at most we review the decision to reconsider only for a particularly egregious abuse of discretion. There was no abuse of discretion here.

The district court could have reconsidered this matter even if the prior decision had been its own, rather than the state court's. See Perez-Ruiz, 25 F.3d at 42; Cabletron Sys., 311 F.3d at 21 n.2; Geffon, 249 F.3d at 38. As the district court noted, there had been no final decision in the state court on personal jurisdiction. The state court's "[d]enial of the Hospital's motion

---

[2] For more on this "effusion of applications," see Coca-Cola Bottling Co. v. Coca-Cola Co., 988 F.2d 386, 411 n.25 (3d Cir. 1993) (noting that although standard of review might be plenary on question of whether district court applied correct law on remand from court of appeals, review is for abuse of discretion on question of whether second judge may hear reargument on an issue already ruled upon by first judge); 18B Wright, Miller, & Cooper, supra, § 4478, at 637 (discussing "the 'mandate rule' that binds a lower court on remand to the law of the case established on appeal"); id. § 4478.1, at 694 ("[R]econsideration often is better deserved, and more important, while an action wends its way toward the first final judgment in the trial court. The balance that must be struck between stability and reaching the right decision is different than the balance to be struck when successive appeals are taken in the same case, or when a trial court faces the mandate of an appellate court, or when different courts come to take part in deciding a single case. Discretion is built into law-of-the-case doctrine, but the measure of discretion is different in these different settings.").

to dismiss was not an appealable order.  In fact, the Hospital tried to appeal, but the Maine Law Court dismissed the appeal as interlocutory . . . ."  The district court put the point well: "Although it is late in the case to re-examine the question, it will be later still on appeal, an avenue open to the Hospital because the personal jurisdiction ruling has never yet been appealable."

One might think there could be a federalism objection to a federal court's reconsidering a state court's interlocutory order entered before removal of the case.  Harlow's absolutist argument against allowing the Hospital to reargue the matter suggests such a consideration.  But the argument proves too much: federalism does not require more deferential treatment of a state-court interlocutory order in a case removed to federal court than it would have required had the order originated in federal court.

The Hospital, for its part, argues that the "law of the case" doctrine does not apply at all in this case, because the doctrine applies "only to those situations in which a court is considering a matter that has already been the subject of a ruling by a coordinate court," and "a state court is not 'coordinate' with a federal court on matters of federal law."  In effect, the Hospital -- without citing any decisions of this court (the Hospital cites only district court decisions for this proposition) -- is arguing for a per se rule that when the prior ruling on an

issue of federal law comes from a state court, law-of-the-case considerations in a removed case are never applicable. Since state courts are also obligated to apply federal law, the premise of the argument is fatally flawed.

In any case, "it would hardly do to reverse a correct ruling . . . on the simplistic ground that it departed from the 'law of the case' established by an earlier ruling," especially where "the order challenged on appeal is subject to de novo review in any event." 18B Wright, Miller, & Cooper, supra, § 4478.1, at 707-09.

## B.      Personal Jurisdiction

Harlow argues that both specific and general personal jurisdiction exist over the Hospital.

The district court analyzed Harlow's claim of personal jurisdiction under the prima facie standard of Boit v. Gar-Tec Products, Inc., 967 F.2d 671 (1st Cir. 1992).[3] Under that

---

[3] In Boit, this court stated:

> The most commonly used method of determining a motion to dismiss for want of personal jurisdiction is for the district court to consider only whether the plaintiff has proffered evidence that, if credited, is enough to support findings of all facts essential to personal jurisdiction. To defeat a motion to dismiss when the court uses this method the plaintiff must make the showing as to every fact required to satisfy "both the forum's long-arm statute and the due process clause of the Constitution." This standard for deciding a motion to dismiss is commonly

standard, the "properly supported proffers of evidence" by the plaintiff are taken as true, without the need for an evidentiary hearing.  Id. at 675; see also Jet Wine & Spirits, Inc. v. Bacardi & Co., 298 F.3d 1, 4 (1st Cir. 2002) (where district court applied prima facie standard as described in Boit, facts for purpose of appeal from dismissal are "[plaintiff's] allegations so far as evidence supports them after preliminary jurisdictional discovery, supplemented by [defendant's] uncontested allegations").

This court reviews de novo a "district court's decision to dismiss for lack of personal jurisdiction when the court held no evidentiary hearing but instead conducted only a prima facie review of the jurisdictional facts."  Jet Wine & Spirits, 298 F.3d at 6-7 (citing Boit, 967 F.2d at 675).

An exercise of jurisdiction must be authorized by state statute and must comply with the Constitution.  See Noonan v. Winston Co., 135 F.3d 85, 89 (1st Cir. 1998).  The Maine long arm statute extends "to the fullest extent permitted by the due process clause of the United States Constitution."  Me. Rev. Stat. Ann.

---

referred to as the "prima facie" standard or a standard requiring a "prima facie" showing.
. . .
    The prima facie showing of personal jurisdiction must be based on evidence of specific facts set forth in the record.

Boit, 967 F.2d at 675 (citations and footnote omitted) (quoting U.S.S. Yachts, Inc. v. Ocean Yachts, Inc., 894 F.2d 9, 11 (1st Cir. 1990)).

tit. 14, § 704-A(1).  This leaves us with the constitutional inquiry.  Two types of personal jurisdiction, general and specific, are at issue here.  See United Elec., Radio and Mach. Workers of Am. v. 163 Pleasant St. Corp. (Pleasant Street I), 960 F.2d 1080, 1088-89 (1st Cir. 1992) (distinguishing the two types).  The plaintiff need not prove the existence of both types of jurisdiction; either one, standing alone, is sufficient.  See Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 34 (1st Cir. 1998).

The due process clause imposes several requirements on the exercise of personal jurisdiction over out-of-state defendants.  First, the defendant must have sufficient "minimum contacts" with the state.  For specific jurisdiction, the plaintiff's claim must be related to the defendant's contacts.  For general jurisdiction, in which the cause of action may be unrelated to the defendant's contacts, the defendant must have continuous and systematic contacts with the state.  Second, for either type of jurisdiction, the defendant's contacts with the state must be purposeful.  And third, the exercise of jurisdiction must be reasonable under the circumstances.  See Cambridge Literary Props., Ltd. v. W. Goebel Porzellanfabrik G.m.b.H & Co. Kg., 295 F.3d 59, 63 (1st Cir. 2002); Noonan, 135 F.3d at 89; Pleasant Street I, 960 F.2d at 1087-89; see also Donatelli v. Nat'l Hockey League, 893 F.2d 459, 462-65 (1st

-11-

Cir. 1990) (examining historical development of personal jurisdiction jurisprudence).

1. Minimum Contacts

"The minimum contacts standard requires that a court asserting personal jurisdiction determine that the nonresident defendant possesses sufficient contacts with the forum state so that subjecting him, her, or it to the forum's jurisdiction does not offend 'traditional notions of fair play and substantial justice.'" Pleasant Street I, 960 F.2d at 1087 (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). Plaintiffs cannot create jurisdiction by their unilateral activity:

> The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State. The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.

Hanson v. Denckla, 357 U.S. 235, 253 (1958).

a. Contacts as Alleged by Harlow

We review the facts in two different categories: first, the evidence before and around the alleged tort, and second, the evidence after and unrelated to the alleged tort.

i. Evidence From Before and During the Period of the Alleged Tort

-12-

Harlow's pediatrician in Maine was the person who recommended that Harlow be examined at the Hospital; the referral was made in the spring of 1993. After recommending an examination at the Hospital and before Harlow's first appointment there, Harlow's pediatrician sent Harlow's medical records from Maine to the Hospital. Harlow had her first appointment at the Hospital on April 27, 1993, and she underwent the contested procedure there on May 10, 1993. It appears that the Hospital discharged Harlow on May 19 or 20, 1993. It is unclear whether Harlow visited the Hospital again after being discharged. The district court believed that there were some follow-up visits, but Harlow did not so allege.[4]

At Harlow's April 27, 1993, appointment, her mother explained to the doctor that she was concerned about the family's ability to pay for the recommended procedure, and the doctor stated that his office would take care of making the necessary arrangements. Before Harlow underwent the procedure, the Hospital obtained authorization from the Maine Medical Assistance Program ("Maine Medicaid"), which approved and agreed to pay for the

---

[4] Harlow alleged only that the Hospital "sought and obtained authorization from" Maine Medicaid for "follow-up care at the Hospital." From the part of the record to which she cites, it appears that the Hospital obtained authorization for a visit during April or May 1995, but Harlow does not claim (or cite any part of the record to show) that such a visit, or any other visit, in fact occurred. There are only two actual visits, then, that Harlow has alleged and provided record support for: the first appointment, and the procedure itself.

procedure.[5]  Ultimately, Maine Medicaid paid over $20,000 to the Hospital for Harlow's procedure and immediate follow-up care at the Hospital.  It appears that the Hospital, before discharging Harlow, performed various tests, including a cerebral CT scan, an MRI, and an ultrasound study of the carotid artery, and that it administered phenobarbital treatment (for an unspecified length of time, but at least on May 17) for left-sided simple partial seizures.

If the state of Maine had not paid for the procedure at the Hospital, the Harlows would not have been able to afford it, and they would have sought other treatment.  After Harlow was discharged from the Hospital, she received "most of her follow up care" from Maine health care practitioners.  Harlow was discharged from the Hospital to the Maine Medical Center for an extensive course of rehabilitation.  Since then, she has been in a special education program and requires a one-on-one aide at school. According to a physician who evaluated Harlow and reviewed her records, Harlow "needs individual psychological counseling as well as a group social training program," and she will have difficulty

---

[5] The district court correctly refused to consider Harlow's contention that the Hospital has maintained "for decades" an "active relationship" with Maine Medicaid, that it had a Provider ID Number before and after May 1993, and that under Maine law it was required to regularly submit documentation to the State of Maine in order to keep its active Provider ID number.  This was because Harlow failed to cite any record evidence to support this contention.  Harlow did cite record evidence to support, and the district court did consider, the Hospital's arranging for Maine Medicaid to pay for Harlow's own treatment.

living independently, maintaining family and social relationships, and earning a living. Harlow alleged that the cost of her future care will be over $800,000.

Harlow alleged a number of communications between the Hospital and various individuals in Maine. There is a letter, dated April 30, 1993,[6] from a Hospital doctor to Harlow's pediatrician, which refers to a prior phone call that the writer made to the pediatrician, and which thanks the pediatrician for referring Harlow to the Hospital. The evidence as to post-procedure communications is sparse. After the procedure, Hospital staff had further communications with Harlow's pediatrician, another pediatrician in Maine, Harlow's mother, and Maine Medicaid. Harlow states that the Hospital "sent multiple correspondence to [these] individuals regarding Danielle," and that when a Hospital doctor spoke with Harlow's mother on the telephone in January 1997, he also sent correspondence, including "various medical articles."

ii. Evidence From After the Alleged Tort

Much of Harlow's evidence concerned the second category: for periods after and unrelated to the alleged malpractice on May

---

[6] Harlow alleged only one pre-1993 contact: that since 1988, the Hospital has sent "relations specialists" to meet with pediatricians and family practitioners. The district court did not consider this contention, because Harlow had not indicated "that these relations specialists ever visited or had any connection with Maine (or even New England)." On appeal, Harlow has still failed to specify whether this outreach program ever included Maine doctors in general or her pediatrician in particular.

10, 1993. We detail the evidence before we address whether the post-tort evidence can be considered for either the specific jurisdiction analysis or the general jurisdiction analysis.

Harlow presented evidence that in 1998 and 1999, roughly 100 inpatients per year were referred to the Hospital from Maine. In 1998, the Hospital charged $2.4 million to Maine Medicaid. In 1999, the Hospital charged $1.6 million to Maine Medicaid for inpatient services plus another $500,000 for outpatient services.

The Hospital was not incorporated in Maine and is not registered to do business there. Harlow alleged that, nevertheless, the Hospital "actively markets and promotes its business and services within Maine's borders." Her proffered evidentiary materials are largely undated and, to the extent they are dated, they post-date her May 1993 procedure.

In particular, Harlow alleged, the "Hospital's marketing department specifically targets physicians located in Maine." Harlow alleged that the Hospital has "initiated a campaign to mail every single pediatrician located in the State of Maine an informational packet." Harlow alleged no time frame here; her only record citation reveals that eighty-two copies of a "Pediatric Specialist Guide" were mailed to Maine pediatricians in 2000, and the Hospital's representative testified that he was unaware of any other referral guides being sent. The Hospital also publishes a monthly newsletter on pediatrics that, since 1999, has been mailed

to "pediatricians who practice in Maine."  The Hospital has also mailed a number of brochures to Maine pediatricians.  Harlow did not allege any specific dates on which brochures were mailed; at the Hospital's deposition, the Hospital's representative testified that some brochures were mailed on one occasion in the spring of 2000 to eighty-two pediatricians in Maine, and that "none of these items that have been marked as exhibits go to patients or consumers."  The Hospital has advertised in the Journal of Pediatrics.  The exhibit Harlow cited for this allegation does not indicate when (or, for that matter, whether) the advertisement was published.  The Hospital's representative testified at the Hospital's July 2000 deposition that "this advertisement is the first I've ever heard of" in a national magazine, and the advertisement had only been created "around two or three weeks ago."

The Hospital has run advertisements in the Boston Globe, which is "widely circulated in Maine."  Harlow alleged that this was "in the 1990's."  At the Hospital's deposition, the representative testified that he was only aware of one paid advertising campaign in the Boston Globe, and it ran for a "three- or four-week period" in 1997.  Harlow also alleged that the Hospital has run an advertisement in a Maine newspaper "on at least one occasion" in October 1996.  She also alleged that the Hospital has advertised on Maine television and radio stations.  She gives

no dates, and the exhibit she cites is a webpage that was apparently last updated in August 2002 and printed in February 2005; the webpage describes then-current and planned broadcast promotions.  Harlow also pointed to other parts of the Hospital's website that "provide information for Maine physicians to refer patients to Children's Hospital, as well as driving directions from Maine to Massachusetts."

### b. Specific Jurisdiction

### i. Waiver

The Hospital initially argues that Harlow's claim of specific jurisdiction is raised for the first time on appeal, and that she therefore waived any specific jurisdiction argument she might have.  The Hospital overstates the record, and, in any event, its own argument on waiver is perfunctory, and so has been waived.[7] United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).  The district court addressed both claims.  We follow suit.

### ii. Standards for Specific Jurisdiction

The evidence produced to support specific jurisdiction must show that the cause of action either arises directly out of, or is related to, the defendant's forum-based contacts.  Pleasant

---

[7] As the district court noted, Harlow relied on general jurisdiction in the state court proceeding.  Harlow's reply to the Hospital's motion to dismiss in the district court does not expressly argue for "specific jurisdiction," but it also does not expressly argue for "general jurisdiction."  Without using either of those terms, the substance of the reply plainly invokes both forms of personal jurisdiction.

Street I, 960 F.2d at 1088-89. The relatedness requirement is not an open door; it is closely read, and it requires a showing of a material connection. This court "steadfastly reject[s] the exercise of personal jurisdiction whenever the connection between the cause of action and the defendant's forum-state contacts seems attenuated and indirect." Id. at 1089 (citing Donatelli, 893 F.2d at 463). "Instead, the defendant's in-state conduct must form an 'important, or [at least] material, element of proof' in the plaintiff's case." Id. (alteration in original) (quoting Marino v. Hyatt Corp., 793 F.2d 427, 430 (1st Cir. 1986)). A broad "but-for" argument is generally insufficient. Because "'but for' events can be very remote, . . . due process demands something like a 'proximate cause' nexus." Cambridge Literary Props., 295 F.3d at 65. And although "strict adherence to a proximate cause standard in all circumstances is unnecessarily restrictive," in most cases "the proximate cause standard better comports with the relatedness inquiry because it so easily correlates to foreseeability, a significant component of the jurisdictional inquiry." Nowak v. Tak How Invs., Ltd., 94 F.3d 708, 715 (1st Cir. 1996). "A 'but for' requirement . . . has in itself no limiting principle; it literally embraces every event that hindsight can logically identify in the causative chain." Id. In sum, although proximate causation is not a per se requirement of specific jurisdiction, its presence or absence is still important. Id. at 715-16.

### iii. <u>Timing of Contacts -- Specific Jurisdiction</u>

There is a preliminary question regarding the universe of facts pertinent to the specific jurisdiction analysis. Three key themes of specific jurisdiction analysis require that the proper focus be on those contacts leading up to and surrounding the claimed injury which are related to the alleged malpractice. Those three concepts are that there be fair notice to the defendant, that the defendant must have purposefully availed itself of the forum state, and that the forum-based activity be truly related to the cause of action. The bulk of Harlow's post-tort evidence of the Hospital's activity in Maine is simply not related at all to the alleged malpractice.

As to the time frame for evidence, we have rejected an argument from a <u>defendant</u> that <u>specific</u> jurisdiction should be measured by contacts after the alleged wrongdoing, where those contacts were more limited than those at the time of the event. <u>See</u> <u>Cambridge Literary Props.</u>, 295 F.3d at 66 ("[F]or purposes of specific jurisdiction, contacts should be judged when the cause of action arose, regardless of a later lessening or withdrawal."). A defendant cannot avoid jurisdiction by shrinking its contacts with the forum after the tort.

This case presents the mirror-image question. The district court understood Harlow, the <u>plaintiff</u>, to be asking that specific jurisdiction be measured in part by contacts after the

-20-

cause of action arose, when those later contacts with the forum state increased. This presents a slightly different set of problems -- particularly as to fair notice to the defendant, purposeful availment, and relatedness.

These three concepts are all related, and they mean that in analyzing specific jurisdiction, contacts must generally be limited to those before and surrounding the accrual of the cause of action. This court has noted, for instance, that "'foreseeability' and 'purposeful availment' bear a family resemblance (the former defining the latter to a considerable extent)," Donatelli, 893 F.2d at 464, and that "foreseeability is critical" in analyzing the relatedness requirement, Pleasant Street I, 960 F.2d at 1089. At heart, these concepts are all designed to ensure that exercises of jurisdiction comport with due process. The Due Process Clause requires fair warning as to where individuals' conduct will subject them to suit, and for purposes of specific jurisdiction, "this 'fair warning' requirement is satisfied if the defendant has 'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471-72 (1985) (citations omitted); see also Pleasant Street I, 960 F.2d at 1088 (citing Hanson's purposeful availment requirement); id. (citing concepts of reasonableness and foreseeability and requirement "that a defendant's 'conduct and

-21-

connection with the forum State [be] such that he should reasonably anticipate being haled into court there'" (alteration in original) (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980))). The relatedness requirement, in particular, "ensures that the element of causation remains in the forefront of the due process investigation." Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 207 (1st Cir. 1994). Because causation is central to the relatedness inquiry, see, e.g., Nowak, 94 F.3d at 714-16; Pleasant Street I, 960 F.2d at 1089, in most cases, contacts coming into existence after the cause of action arose will not be relevant.

iv. Analysis

Harlow's argument in support of specific jurisdiction is that "[s]imply stated, but for Children's Hospital's contacts with the State of Maine, Danielle Harlow never would have undergone the surgical procedure that she did, and she never would have suffered her injuries." Harlow points to the following facts: (1) the Hospital's staff communicated by telephone and by written correspondence with Harlow's doctor in Maine before and after the procedure; (2) the Hospital scheduled the surgery in advance and knew that Harlow was coming from Maine; (3) Harlow's pediatrician, who referred her to the Hospital, was a target of the Hospital's "outreach program"; (4) before the procedure, and during her first visit, Harlow's mother informed the Hospital's staff that the family was of modest means, and the Hospital responded by

-22-

contacting Maine Medicaid to obtain prior approval for the procedure; (5) after the procedure, the Hospital arranged for Harlow to receive inpatient rehabilitation at the Maine Medical Center; and (6) a doctor at the Hospital communicated with Harlow's physicians in Maine "on repeated occasions" and contacted the Maine government to obtain approval for follow-up care. Harlow stresses the Hospital's contacts with Maine Medicaid, arguing that those contacts were financially beneficial to the Hospital and constituted purposeful availment of the benefits and protections of Maine law.

When the post-event evidence unrelated to the alleged malpractice is excluded, Harlow has not made out an adequate case for specific jurisdiction. Harlow's "but-for" theory -- that but for the referral from a Maine pediatrician, the harm would never have happened -- is insufficient to give Maine specific jurisdiction over the Hospital. The place of the alleged tort was not Maine but Massachusetts. There is no evidence that the Hospital purposefully induced Harlow to leave Maine to come to Massachusetts. There is not even any evidence that the Hospital induced the pediatrician to refer the patient to Maine. That the reputation and expertise of an institution lead to referrals from out of state cannot be enough to establish specific jurisdiction.

Harlow makes much of the uncontested fact that the Hospital was "well aware that [she] was coming from Maine" and

would likely return there.  If that rationale -- an out-of-state plaintiff availing herself of services in Massachusetts -- were sufficient, then the Hospital would be subject to suit for merely taking a patient from elsewhere.  That the consequences of medical care remain with a patient throughout her lifetime provides even less of a basis to assert jurisdiction.  Jurisdiction cannot be created by and does not travel with the plaintiff patient wherever she goes.

The nature of the activity in which the defendant is engaged is important.  The Hospital is not engaged in the interstate sale of tangible goods, capable of doing harm elsewhere.  Even if it were, "'mere awareness' that a product may end up in the forum state does not constitute 'purposeful availment.'" Boit, 967 F.2d at 683; id. at 682-83 (discussing Asahi Metal Indus. Co. v. Superior Court of Cal., 480 U.S. 102 (1987)).  Compare Int'l Shoe Co., 326 U.S. at 314-15, 320 (personal jurisdiction proper where defendant's salesmen resided in state, they displayed samples and engaged in "regular and systematic solicitation of orders in the state," "a substantial volume of merchandise [was] regularly shipped by [defendant] to purchasers within the state," and cause of action arose out of defendant's in-state activities), with Rodriquez v. Fullerton Tires Corp., 115 F.3d 81, 85 (1st Cir. 1997) (stating that even if third-party defendant had specific knowledge that the stream of commerce would move its product into the forum

-24-

state, "this awareness alone would not be enough to constitute the purposeful availment which is necessary for a showing of minimum contacts" (emphasis added)).

Rather than putting goods into the "stream of commerce," the Hospital rendered medical care, a professional and highly personal service, and it did so entirely in Massachusetts. As the Ninth Circuit has explained:

> In the case of personal services focus must be on the place where the services are rendered, since this is the place of the receiver's (here the patient's) need. The need is personal and the services rendered are in response to the dimensions of that personal need. They are directed to no place but to the needy person herself. It is in the very nature of such services that their consequences will be felt wherever the person may choose to go. However, the idea that tortious rendition of such services is a portable tort which can be deemed to have been committed wherever the consequences foreseeably were felt is wholly inconsistent with the public interest in having services of this sort generally available.

Wright v. Yackley, 459 F.2d 287, 289-90 (9th Cir. 1972). We reject Harlow's portable tort theory.

Harlow also relies on other contacts, such as the Hospital's dealings with Maine Medicaid and a handful of personal communications about Harlow's treatment between the Hospital and various individuals in Maine. The fact that Maine, through the Maine Medicaid program, paid for the surgery is not a great deal different for specific jurisdiction purposes than if Harlow's

-25-

parents had written in Maine and mailed to the Hospital a check on their Maine bank account. A Maine patient will presumably pay, either through insurance or otherwise, for services at the Hospital. In Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408 (1984), the Supreme Court said that the defendant's acceptance of checks drawn on a forum-based bank was "of negligible significance for purposes of determining whether [the defendant] had sufficient contacts in [the forum]." Id. at 416. The Court observed that "[c]ommon sense and everyday experience suggest that, absent unusual circumstances, the bank on which a check is drawn is generally of little consequence to the payee and is a matter left to the discretion of the drawer."[8] Id. at 416-17 (footnote omitted). While the utilization of Medicaid from the patient's state may cause extra communication and paperwork, it does not by itself rise to the level of importance necessary to establish specific jurisdiction.

We affirm the finding of lack of specific jurisdiction.

c. General Jurisdiction

General jurisdiction may exist "when the litigation is not directly founded on the defendant's forum-based contacts, but

---

[8] In Helicopteros, there was "no indication that [the defendant] ever requested that the checks be drawn on a [forum] bank or that there was any negotiation between [the parties] with respect to the location or identity of the bank on which checks would be drawn." 466 U.S. at 416. Here, the Hospital did arrange for payment from Maine Medicaid, but this was at the plaintiff's request.

the defendant has nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the forum state." Pleasant Street I, 960 F.2d at 1088 (citing Helicopteros, 466 U.S. at 414-16 & n.9); see also Helicopteros, 466 U.S. at 416 (focusing on question of whether defendant's contacts with forum state "constitute the kind of continuous and systematic general business contacts the Court found to exist in" Perkins v. Benguet Consolidated Mining Co., 342 U.S. 437 (1952)). "The standard for evaluating whether . . . contacts satisfy the constitutional general jurisdiction test 'is considerably more stringent' than that applied to specific jurisdiction questions." Noonan, 135 F.3d at 93 (quoting Glater v. Eli Lilly & Co., 744 F.2d 213, 216 (1st Cir. 1984)).

        i. Timing of Contacts -- General Jurisdiction

We first resolve a preliminary matter. At oral argument, the parties disputed which time frame of evidence was relevant in deciding whether the Hospital's contacts with Maine are sufficient to justify general jurisdiction. Harlow argued that for purposes of general jurisdiction, we should look at the Hospital's contacts up to the time of the filing of the complaint, well beyond the time of the alleged tort. The Hospital relied by analogy on Cambridge Literary Properties for the proposition that, even when general jurisdiction is alleged, "contacts should be judged when the cause of action arose." 295 F.3d at 66. We disagree with the Hospital.

-27-

It is settled law that unrelated contacts which occurred after the cause of action arose, but before the suit was filed, may be considered for purposes of the general jurisdiction inquiry.

In Noonan, we expressly rejected the argument now made by the Hospital. See 135 F.3d at 93 n.8 ("The parties clash over which contacts should be considered in the general jurisdiction analysis. . . . [T]hey dispute whether a foreign corporation's contacts with the forum should be measured up to the time of the alleged tort, up to the time the complaint is filed, or at any time. We have considered all contacts established up to the time [the plaintiff] filed his complaint."). In Helicopteros, where the helicopter crash at the center of the lawsuit had occurred in January 1976, the Supreme Court considered contacts through the year 1977. See 466 U.S. at 410-11. On the other hand, contacts after the filing of the complaint are not considered. See, e.g., United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 619 n.4 (1st Cir. 2001) ("[W]e consider only contacts established before the government filed its complaint in December 1997 . . . .").

The reason for this approach stems from the basic distinction between specific and general jurisdiction. Wright and Miller, in discussing this distinction, state:

> As a practical matter, a general jurisdiction inquiry is very different from a specific jurisdiction inquiry. As one Court of Appeals put it,

> Unlike the specific jurisdiction analysis, which focuses on the cause of action, the defendant and the forum, a general jurisdiction inquiry is dispute blind, the sole focus being on whether there are continuous and systematic contacts between the defendant and the forum.
>
> Accordingly, a court should consider all of a defendant's contacts with the forum state prior to the filing of the lawsuit, rather than just those contacts that are related to the particular cause of action the plaintiff asserts.

4 Wright & Miller, Federal Practice and Procedure § 1067.5, at 520-21 (3d ed. 2002) (footnote omitted) (quoting Dickson Marine, Inc. v. Panalpina, Inc., 179 F.3d 331, 339 (5th Cir. 1999)); see also Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 569-70 (2d Cir. 1996) ("In general jurisdiction cases, district courts should examine a defendant's contacts with the forum state over a period that is reasonable under the circumstances -- up to and including the date the suit was filed -- to assess whether they satisfy the 'continuous and systematic' standard.").

### ii. Analysis

In support of general jurisdiction, Harlow points to the Hospital's "ongoing relationship" with Maine Medicaid, the fact that the Hospital derives "substantial and consistent revenue" from Maine, the Hospital's active marketing and advertising to physicians and the general public in Maine, and the fact that the Hospital "holds itself [out] as the regional pediatric trauma

-29-

center."  Harlow argues that all of this amounts to "engag[ing] in the 'continuous and systematic' pursuit of general business activities" in Maine.  Glater, 744 F.2d at 216 (quoting Perkins, 342 U.S. at 448).[9]

The Hospital, for its part, points to other facts which have not been disputed: the Hospital is organized under Massachusetts law and has its principal place of business in Boston, Massachusetts; the Hospital does not own or use real estate or maintain branch offices or other places of business in Maine; it provides no medical services in Maine; and it "participates in no arrangements to provide consultation, advice, services, or use of its equipment or facilities to Maine health care providers." Although it has on occasion sent mailings to 82 pediatricians in Maine and it maintains a website accessible in Maine, the Hospital does not actually do business through its website, and Maine residents account for only about 100 out of 18,000 annual patient admissions in Massachusetts.  The Hospital argues that its contacts fall "well below the levels of contacts that [have] previously [been] found insufficient to support general jurisdiction."  We agree.

---

[9] Harlow argues that her case is analogous to the case of Kenerson v. Stevenson, 604 F. Supp. 792 (D. Me. 1985), which held that general jurisdiction in Maine existed over a New Hampshire hospital that had treated a Maine resident who had arrived with injuries received in New Hampshire.  Whether Kenerson is correct or not, the evidence here does not establish general jurisdiction.

-30-

As we have held in other cases, "where 'defendant's only activities consist of advertising and employing salesmen to solicit orders, we think that fairness will not permit a state to assume jurisdiction.'" Glater, 744 F.2d at 217 (quoting Seymour v. Parke, Davis & Co., 423 F.2d 584, 586-87 (1st Cir. 1970)). We repeat Glater's summary of Seymour, because we are facing an essentially similar fact pattern:

> In Seymour, a manufacturer and distributor of [a] drug was sued in New Hampshire for injuries occurring in Massachusetts. The defendant maintained no office and engaged in no manufacturing in New Hampshire; it held no property there; it was not registered to do business there. Its only contacts with New Hampshire consisted of advertising and the activities of a half dozen salesmen, mostly New Hampshire residents, who accepted orders and disseminated product information to New Hampshire physicians, hospitals and retail pharmacies.

Id. at 217.

Harlow argues that a nontrivial number of the Hospital's patients come from Maine and have their treatment paid for by Maine Medicaid. The Hospital points out that using Harlow's figures -- she alleges that Maine Medicaid pays the Hospital roughly $2 million annually, and that the Hospital's total annual revenue is almost $400 million -- Maine Medicaid payments account for only 0.5% of the Hospital's revenues.

Treating patients from Maine in Massachusetts, even on a regular basis, is not the same as engaging in continuous and

systematic activity in Maine.  A hospital that treats Maine residents in Massachusetts is, quite simply, in a different position from a hospital that treats Maine residents in Maine, or a firm that sells products to Maine residents in Maine.  That the Hospital derives revenue from treating Maine patients, sometimes in the form of payments from Maine Medicaid, does not alter the basic fact that the Hospital is not "engaged in continuous and systematic activity, unrelated to the suit, in [Maine]."  Pleasant Street I, 960 F.2d at 1088; see also Wolf v. Richmond County Hosp. Auth., 745 F.2d 904, 906, 910 (4th Cir. 1984) (no general jurisdiction even though, among other things, defendant hospital "treats [forum-state] residents and receives payments (either from state or local governmental bodies or from the residents themselves) for services rendered," some of the payments included "medicaid/medicare reimbursements," and "approximately one-fifth" of defendant's income came from forum-state residents); 4 Wright & Miller, supra, § 1067.5, at 507 ("[T]he defendant must be engaged in longstanding business in the forum state, such as marketing or shipping products, or performing services or maintaining one or more offices there; activities that are less extensive than that will not qualify for general in personam jurisdiction.").

2. Reasonableness of Exercise of Jurisdiction

Even if the Hospital's contacts with Maine were minimally sufficient for either specific or general jurisdiction, we would

-32-

still conclude that the exercise of jurisdiction here would be unreasonable. "[E]ven where purposefully generated contacts exist, courts must consider a panoply of other factors which bear upon the fairness of subjecting a nonresident to the authority of a foreign tribunal." Pleasant Street I, 960 F.2d at 1088. "[G]auging fairness requires an assessment of reasonableness for, in certain circumstances, unreasonableness can trump a minimally sufficient showing of relatedness and purposefulness." Ticketmaster-New York, 26 F.3d at 210. The factors to be considered, known as the "Gestalt factors," Pleasant Street I, 960 F.2d at 1088 (quoting Donatelli, 893 F.2d at 465), include:

> (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

Id. (citing Burger King, 471 U.S. at 477).

"[T]he reasonableness prong of the due process inquiry evokes a sliding scale." Ticketmaster-New York, 26 F.3d at 210. In other words, "the weaker the plaintiff's showing on the first two prongs (relatedness and purposeful availment), the less a defendant need show in terms of unreasonableness to defeat jurisdiction. The reverse is equally true: an especially strong

showing of reasonableness may serve to fortify a borderline showing of relatedness and purposefulness."  Id.

It is true that Harlow "has an interest in litigating conveniently in [her] home state, which in turn has an interest in affording its citizens a convenient forum."  Cambridge Literary Props., 295 F.3d at 66.  But even though Maine has an interest in protecting its residents, Massachusetts has a like interest, one made stronger by the fact that it has an interest as a sovereign in a case arising from the conduct -- here, medical practice -- that occurs within its borders.  Of course, "[t]he purpose of the inquiry is not to compare the forum's interest to that of some other jurisdiction, but to determine the extent to which the forum has an interest," Foster-Miller, Inc. v. Babcock & Wilcox Can., 46 F.3d 138, 151 (1st Cir. 1995), but here Maine has only a slight interest.  "Although a forum state has a significant interest in obtaining jurisdiction over a defendant who causes tortious injury within its borders, that interest is diminished where the injury occurred outside the forum state."  Nowak, 94 F.3d at 718 (citations omitted).

Further, Massachusetts law, not Maine law, would govern this dispute.  See Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 62 (1st Cir. 2002) (citing the fact that forum state's law governs the dispute as one factor in favor of exercising personal jurisdiction there); Estate of Johnson, 2001 ME

-34-

39, ¶ 6, 766 A.2d 592, 594 (Maine has adopted the "most significant contacts and relationships" test for choice of law, providing that "[i]n an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship . . . to the occurrence and the parties" (quoting Restatement (Second) of Conflict of Laws § 146 (1969))).  As in Donatelli, Maine's "sovereignty is not threatened; apart from a generalized concern for the rights of its own domiciliaries, the state has no real interest in adjudicating the controversy.  In point of fact, the opposite seems true . . . ."  893 F.2d at 472.

Harlow argues that recognizing jurisdiction in Maine would be fair, because her family is of limited means, whereas the Hospital has annual revenues of $400 million.  Harlow also argues: "Whereas litigating this case in Maine will cause little, if any, inconvenience to the Children's Hospital, Danielle Harlow has no other forum for her case to be heard."  The argument is exactly backwards.  Harlow did have an obvious and readily available forum in Massachusetts.  The fact that she missed the statute of limitations in Massachusetts does not add to her argument at all. To hold otherwise would encourage plaintiffs to deliberately miss

a statute of limitations for purposes of forum manipulation.[10] Such a practice should be discouraged, not rewarded.

Another interest is at stake -- "the common interest[] of all sovereigns in promoting substantive social policies." Pleasant Street I, 960 F.2d at 1088. This factor weighs against the reasonableness of exercising personal jurisdiction in Maine. All sovereigns share an interest in promoting the social policy of having quality health care available to those who need it. One way to promote this policy is to limit the length of time during which health care providers are exposed to lawsuits arising from the care they provide. Here, for instance, Massachusetts has set a three-year statute of limitations for malpractice claims against its hospitals. See Mass. Gen. Laws ch. 231, § 60D. Maine has a minimal interest in seeing that this limit be avoided, and the common interest of all sovereigns (including Maine) in seeing that this limit be observed is strong, especially in light of the fact that the Hospital did not purposefully conduct business in or

---

[10] This court has addressed concerns about manipulation and statutes of limitations in other contexts. Cf. Noonan, 135 F.3d at 95 (discussing, in the context of temporal limitations on jurisdictional discovery, the risk that "undesirable exploitation of statute of limitations periods" will occur and that "[s]avvy plaintiffs who wait until the end of the limitations period to maximize the chance of asserting jurisdiction will be rewarded for their dilatory tactics"); Seymour, 423 F.2d at 585-86 (exercise of jurisdiction unfair where "plaintiff . . . is unconnected with the forum and is not 'convenienced' by being able to sue there except that she has lost her right to sue in what would otherwise have been the fair and convenient state" because of the expiration of that state's statute of limitations).

specifically direct its activities toward another state which has a longer statute of limitations.

As to the disparity in resources, that has little to do with due process limits on the extension of long-arm jurisdiction. The law is not oblivious to financial considerations. But even though the defendant's burden of appearing and the plaintiff's interest in obtaining convenient and effective relief are included among the "Gestalt factors" for the personal jurisdiction analysis, see Pleasant Street I, 960 F.2d at 1088, sheer disparity in wealth is not.

The argument Harlow raises of relative convenience and burden is more appropriately dealt with under the law of forum non conveniens or change of venue. Where a plaintiff properly establishes jurisdiction in one federal district court, she is free to argue for a transfer to another federal district court. See 28 U.S.C. § 1404(a) ("For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."). Even under the doctrines of forum non conveniens and change of venue, it is not clear that sheer disparity in wealth is legally relevant, without proof of hardship. See Iragorri v. Int'l Elevator, Inc., 203 F.3d 8, 17 (1st Cir. 2000).

In the end, this case is about a patient who lives in Maine and was referred by a Maine doctor to a hospital in Boston,

and who underwent a medical procedure in Boston which gave rise to a cause of action; she returned to Maine and the procedure was paid for from Maine.  That cannot be enough to subject the Hospital to suit in Maine.  The question is not whether hospitals may be held responsible in lawsuits for their activities, but whether they may be haled into court out of state because they accept out-of-state patients.  It would be unreasonable to conclude that they could.

### III.

The district court's order granting the Hospital's motion to dismiss for lack of personal jurisdiction is **<u>affirmed</u>**.  Each side shall bear its own costs.