**Forrest PETTENGILL, Plaintiff,**

v.

**Howard CURTIS, et al., Defendants.**

**C.A. No. 07–12174–MLW.**

United States District Court, D. Massachusetts.

Sept. 30, 2008.

Lisa G. Arrowood, Matthew J. Fogelman, Todd & Weld LLP, Boston, MA, for Plaintiff.

Frank C. Corso, Sarrouf Corso, LLP, Michele E. Randazzo, Jackie A. Cowin, Kopelman & Paige, P.C., Michael J. Mazurczak, Raymond H. Tomlinson, Jr., Melick, Porter & Shea, LLP, Boston, MA, for Defendants.

*MEMORANDUM AND ORDER*

WOLF, District Judge.

Paul Ernst ("Ernst"), Joseph Anglim ("Anglim"), and David Park ("Park") (collectively the "Individual Defendants") have moved to dismiss Counts 10, 11, and 12 of the Amended Complaint against them for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). The City of Haverhill, Massachusetts ("Haverhill") has moved to dismiss Counts 6, 7, and 8 of the Amended Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For the reasons stated in this Memorandum, the Individual Defendants' motions to dismiss are being allowed, and Haverhill's motion to dismiss is being allowed in part and denied in part. More specifically, Haverhill's motion to dismiss is being allowed as to Count 6, based on the statute of limitations, and denied as to Counts 7 and 8.

## I. BACKGROUND

In the Amended Complaint ("Am. Compl."), plaintiff Forrest Pettengill ("Pettengill") alleges that he was sexually abused by his Boy Scout assistant scoutmaster, defendant Howard Curtis ("Curtis"), while in the Boy Scouts and then later while Curtis was employed at the

Haverhill Public Library.[1] Therefore, he has sued Curtis, the City of Haverhill, the Boy Scouts of America ("BSA"), the Yankee Clipper Council ("Yankee Clipper"), which is a Boy Scout unit based in Haverhill and a successor entity to the Lone Tree Council of which Pettengill was a member, and five current or former executives of BSA. In addition to the Individual Defendants who have moved to dismiss, the other BSA-related defendants are John Doe One, an individual unknown to Pettengill who served as a liaison between BSA and the Lone Tree Council, and John Doe Two, the executor or administrator of the estate of James Tarr, the late former Chief Scout Executive of BSA.

Pettengill's claims against the various defendants include sexual harassment under Mass. Gen. Laws ch. 151B (Curtis, Count 1, and Haverhill, Count 6), sexual assault and battery (Curtis, Count 2), intentional infliction of emotional distress (Curtis, Count 3), negligence (Curtis, Count 4, and Haverhill, Count 7), negligent infliction of emotional distress (Curtis, Count 5, and Haverhill, Count 8), "respondeat superior" (BSA and Yankee Clipper, Count 9), and three negligence-related claims against BSA, Yankee Clipper, Ernst, Anglim, Park, John Doe One, and John Doe Two (Counts 10, 11, and 12).

The case was removed from Essex Superior Court pursuant to 28 U.S.C. § 1441. Jurisdiction is based on diversity of citizenship under 28 U.S.C. § 1332.

## II. FACTS

The following are facts alleged in the Amended Complaint. Curtis began sexually abusing Boy Scouts, including David Carter and Edward Gilmore, in the mid–1970's. ¶¶ 13–14. He would give them alcohol and sleep one-on-one in tents with them, and molested Carter "hundreds of times" and Gilmore "approximately six times in a two-year span." ¶¶ 15–21.

Pettengill joined the Lone Tree Council of the Boy Scouts at approximately age eleven in 1983 or 1984. ¶ 33. Starting in approximately 1984 or 1985, Curtis, who was an assistant scoutmaster of Pettengill's troop, molested Pettengill "hundreds of times," including on camping trips, when sleeping one-on-one in a shared tent. ¶¶ 35–40. Curtis wrote Pettengill love letters and told him that their relationship was normal. ¶ 41. All defendants other than Curtis and Haverhill had a duty to supervise Curtis and to put policies in place to prevent such sexual abuse, but either did not do so or did so negligently. ¶¶ 44–49. But for these failures, Curtis could have been prevented from abusing Pettengill, such as by banning Curtis from the Boy Scouts. ¶ 48.

The Boy Scouts have had problems with sexual abuse by scoutmasters for decades, and knew about them for nearly 100 years. ¶ 54. In 1911, BSA developed ineligible volunteer files, also known as confidential files, which were kept on men who were deemed ineligible to serve or volunteer with the Scouts, including child molesters. *Id.* These files were kept in the national office in part to make them harder to subpoena. ¶ 55. In the early to mid–1970's, the Boy Scouts had information that scoutmasters were encouraging boys to share tents or sleeping bags with them. ¶ 58. Furthermore, in the 1970's and 1980's, the Individual Defendants were responsible for the confidential files, including investigating and banning individuals

---

**1.** The parties jointly represent that Curtis was charged with two counts of statutory rape of Pettengill in *Commonwealth v. Howard Curtis,* ESCR2007–00856, and that he pled guilty to both counts and was sentenced to four to six years imprisonment. *See* Parties' Joint Statement Pursuant to Local Rule 16.1 (Docket No. 36) at 3.

suspected of wrongdoing. ¶ 59. Despite their actual knowledge of the abuse problems in general and at least one incident in Massachusetts, the Individual Defendants and BSA did not warn Scouts or their parents about the potential for abuse until 1988. ¶¶ 61, 64–66, 68–76.

Curtis worked at the Haverhill Public Library starting in the mid–1970's. ¶ 23. In approximately 1976–77, he recruited Carter and Gilmore, who were then two teenaged Boy Scouts whom he was already sexually abusing, to work for him at the Library. ¶¶ 25, 28. Curtis spent an unusual amount of time with each boy in one-on-one situations, and sexually abused Carter at the Library and elsewhere. ¶¶ 26–27, 29. In 1980, the City promoted Curtis to Library Director, although it knew or should have known that he had a pattern of recruiting young boys from the Boy Scouts and was abusing Carter at the Library. ¶ 31. As Library Director, Curtis had greater autonomy and authority than before, and was "virtually supervised." ¶ 32.[2]

Subsequently, starting in approximately 1986, Curtis recruited Pettengill, who began working for the City of Haverhill in the Library "on and off" on a part-time basis. ¶ 79. Curtis repeatedly abused Pettengill both while Pettengill was an employee and when he was not. ¶ 80. Curtis was Pettengill's direct supervisor at the Library. ¶ 81. He lured Pettengill to the Library after business hours for sexual activity. ¶ 82. He told Pettengill that their relationship was normal and natural, and gave him gifts. ¶ 83. Haverhill knew or should have known of Curtis's pattern of luring and abusing young boys dating back at least to approximately 1976, and failed to act reasonably in hiring, supervising, and promoting Curtis. ¶¶ 84–88.

Pettengill had psychiatric problems "[t]hroughout the 1990's," including hyper-

sexuality and sexual identity confusion, but led a "relatively 'normal' life" until 2002. ¶ 92. In 2002 through 2005, he had such serious problems, including "a psychotic episode" in 2004, that he lost his job and his house, used drugs, and was eventually diagnosed with post-traumatic stress disorder, obsessive-compulsive disorder, and bipolar disorder. ¶¶ 93–95. Not until 2006, when he was undergoing therapy, did he realize that Curtis had sexually abused and harassed him, and that his psychiatric injuries were due to that abuse. ¶¶ 97–98.

Apart from the allegations in the Amended Complaint, Pettengill states in his opposition to the Individual Defendants' motions to dismiss that while the Boy Scouts have refused to give him access to any confidential files, including that of Curtis, he has located 59 confidential files on molesters in Massachusetts. They include 164 letters sent by Ernst to scout leaders in Massachusetts and 84 letters received from them between 1971 and 1991. Pettengill alleges that Ernst engaged in this correspondence "in consultation with Park and Anglim." Pl. Opp. to Ind. Defs. Mot. to Dismiss at 2. He supports these allegations with redacted examples of confidential files, affidavits, deposition transcripts of the Individual Defendants from other cases, and other materials. Pettengill does not, however, allege that any of the Individual Defendants had actual knowledge that Curtis was abusing him at the time. Nor does he allege that any of them wrote a letter or did anything else concerning Curtis.

## III. INDIVIDUAL DEFENDANTS

### A. *Legal Standard*

██ Where, as here, it has been challenged, Pettengill has the burden of show-

---

**2.** It is unclear whether Pettengill means that Curtis was virtually unsupervised.

ing that the court has personal jurisdiction over each of the defendants. *See McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Ticketmaster–New York v. Alioto*, 26 F.3d 201, 207 n. 9 (1st Cir.1994); *Tidgewell v. Loon Mountain Recreation Corp.*, 820 F.Supp. 630, 631 (D.Mass.1993). Since none of the Individual Defendants are alleged to be residents of Massachusetts, to own property here, or to have otherwise consented to the court's jurisdiction, personal jurisdiction is only appropriate if the defendants fall within the Massachusetts long-arm statute, Mass. Gen. Laws ch. 223A, § 3, and exercising jurisdiction comports with the requirements of due process. *See, e.g., World Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

■ On a motion to dismiss for lack of personal jurisdiction, courts most commonly apply a "prima facie" standard, under which "the plaintiff [must] proffer[ ] evidence that, if credited, is enough to support findings of all facts essential to personal jurisdiction." *Boit v. Gar–Tec Prods., Inc.*, 967 F.2d 671, 675 (1st Cir. 1992). "The prima facie showing of personal jurisdiction must be based on evidence of specific facts set forth in the record. The plaintiff must go beyond the pleadings and make affirmative proof." *Id.* (citations and quotations omitted). The court must not act as a factfinder, instead "accept[ing] properly supported proffers of evidence by a plaintiff as true." *Id.* However, it need not "credit conclusory allegations or draw farfetched inferences." *Ticketmaster–New York*, 26 F.3d at 203. The parties implicitly agree that the prima facie standard should be employed to decide the Individual Defendants' motions to dismiss and address it in their submissions.

### B. Long–Arm Statute

■ While the parties focus their arguments primarily on the due process inquiry, that issue only becomes relevant if a statute authorizes personal jurisdiction. *See United Electrical Workers v. 163 Pleasant Street Corp.*, 960 F.2d 1080, 1086 (1st Cir.1992). Pettengill argues that two provisions of the Massachusetts long-arm statute apply, specifically:

> A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's
>
> (a) transacting any business in this commonwealth;
>
> . . .
>
> (d) causing tortious injury in this commonwealth by an act or omission outside this commonwealth if he . . . engages in any [ ] persistent course of conduct . . . in this commonwealth . . .

Mass. Gen. Laws ch. 223A § 3.

■ For § 3(a) to apply, "the defendant must have transacted business in Massachusetts, and the plaintiff's claim must have arisen from the transaction of business by the defendant." *Tatro v. Manor Care, Inc.*, 416 Mass. 763, 767, 625 N.E.2d 549 (1994). The "transacting business" requirement extends to any contacts that would support jurisdiction under the due process clause of the Fourteenth Amendment, and so that inquiry merges with the constitutional analysis which is done below. *See Cambridge Literary Props., Ltd. v. W. Goebel Porzellanfabrik G.m.b.H.*, 295 F.3d 59, 63 (1st Cir.2002). A claim "arises from" a transaction of business when it would not have arisen "but for" the transaction of business in the commonwealth. *See Tatro*, 416 Mass. at 770–71, 625 N.E.2d 549.

■ As discussed more fully below, the only purported contacts of the Individual

Defendants with Massachusetts for which Pettengill has offered evidence are omissions relating to their policymaking roles at BSA and correspondence with scoutmasters in Massachusetts regarding abuse allegations unrelated to Curtis. It cannot be said that the correspondence is, as required, a "but for" cause of Pettengill's injuries because whether the Individual Defendants knew about other abuse is not causally linked to any alleged negligence regarding Curtis.

The failures to act may be a "but for" cause of Pettengill's alleged abuse by Curtis, in the sense that warnings and policies to prevent abuse might have prevented the alleged abuse from occurring. However, as explained below, any omissions or failures to act did not occur in Massachusetts.

Therefore, there are not the sufficient "minimum contacts" with Massachusetts necessary to find that the exercise of jurisdiction would satisfy the requirements of due process. *See Chlebda v. H.E. Fortna and Brother, Inc.*, 609 F.2d 1022, 1023–24 (1st Cir.1979). Accordingly, the claims against the Individual Defendants do not arise out of the transaction of business by them in the Commonwealth. *See Cambridge Literary Props.*, 295 F.3d at 63.

■ Section 3(d) of the Massachusetts long-arm statute could conceivably provide jurisdiction over Pettengill's claim concerning alleged omissions or failures to act outside of Massachusetts. However, even if the required level of causation were present, § 3(d) would only apply if general jurisdiction existed over the Individual Defendants. *See Conn. Nat'l Bank v. Hoover Treated Wood Prods.*, 37 Mass.App.Ct. 231, 233 n. 6, 638 N.E.2d 942 (1994)(stating that § 3(d) of the long-arm statute, dealing with tortious acts outside the Commonwealth, "is predicated on general jurisdiction."). As explained below, general jurisdiction is absent here. *See, e.g., Noonan v. Winston Co.*, 135 F.3d 85, 92–93 (1st Cir.1998).

## C. Due Process

■ In order for personal jurisdiction to exist, due process requires that the defendant have sufficient "minimum contacts" with a state that subjecting him to that forum's jurisdiction will not offend the " 'traditional notions of fair play and substantial justice.' " *United Elec. Workers*, 960 F.2d at 1087 (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). The two recognized types of personal jurisdiction are "general" and "specific" jurisdiction:

> General jurisdiction exists when the litigation is not directly founded on the defendant's forum-based contacts, but the defendant nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the forum state ... Specific jurisdiction may be asserted where the cause of action arises directly out of, or relates to, the defendant's forum-based contacts.

*Id.* at 1088–89.

■ General jurisdiction exists when a defendant is domiciled in the forum state or his activities there are "substantial" or "continuous and systematic." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414–16, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). These contacts must be "so substantial and of such a nature as to justify suit against [the defendant] on causes of action arising from dealings entirely different from those activities." *International Shoe*, 326 U.S. at 318, 66 S.Ct. 154. The evidence of contacts proffered is not sufficient to justify a finding that general jurisdiction exists. *See, e.g., Noonan*, 135 F.3d at 92–93. In *Noonan*, the court found no general jurisdiction even though the company's employees

regularly solicited business and the company transacted $585,000 in business in Massachusetts. Similarly, in *Roy v. Roy*, 47 Mass.App.Ct. 921, 715 N.E.2d 70 (1999), the court found no general jurisdiction where the defendant was an officer and director of a Massachusetts corporation, had a Massachusetts bank account on which two checks to the plaintiff were written, and sent copies of correspondence to the plaintiff's attorney in Massachusetts. The Individual Defendants' alleged contacts with Massachusetts are well short of those found insufficient in *Noonan* and *Roy.*

▮ In the absence of general jurisdiction, Pettengill must establish specific jurisdiction, which requires minimum contacts with the forum state that are related to the cause of action, and that it be reasonable to assert jurisdiction. *See Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 35 (1st Cir.1998). At least in the context of tort claims, the plaintiff must show both "but for" causation and a level of causation somewhere between "but for" causation and the proximate causation standard of tort law. *See Harlow v. Children's Hosp.*, 432 F.3d 50, 60–61 (1st Cir.2005). This means that "the defendant's in-state conduct must form an important, or at least material, element of proof in the plaintiff's case." *Id.* (quotations and citations omitted). Significantly for this case, personal jurisdiction must be based on an individual's contacts and not those of the corporation of which he is an officer or employee. *See Morris v. UNUM Life Ins. Co. of Am.*, 66 Mass.App. Ct. 716, 720–21, 850 N.E.2d 597 (2006).

▮ Pettengill cites two sets of activities that he asserts are sufficient to establish specific jurisdiction over the Individual Defendants. First, he alleges that the Individual Defendants, despite having actual knowledge of problems with sexual abuse by scoutmasters, failed to implement policies designed to prevent such abuse and failed to warn parents and scouts of the dangers of abuse. Second, he alleges that the Individual Defendants were responsible for maintaining the confidential files, and in doing so Ernst, in consultation with Park and Anglim, corresponded with scout troops in Massachusetts over the course of many years. Pettengill describes 164 letters sent by Ernst to scout leaders in Massachusetts and 84 letters received from them between 1971 and 1991.

However, neither the failures to act nor the letters provide the minimum contacts required to establish personal jurisdiction over the Individual Defendants in Massachusetts. The First Circuit in *Chlebda v. H.E. Fortna and Brother, Inc.*, 609 F.2d 1022 (1st Cir.1979), rejected the idea that an allegedly tortious failure to act generally can provide the required minimum contacts with a forum state. In *Chlebda*, the plaintiff was allegedly injured by a negligently designed forklift. *Id.* at 1023. The plaintiff sued an out-of-state dealer that had not supplied this particular forklift, but generally dealt in that type of forklift and allegedly knew of the defect, but failed to warn the plaintiff or his employer of it. *Id.* at 1023 & n. 1. The First Circuit stated:

> [Plaintiff asserts] that the omission occurred where the unwarned person resided. This somewhat metaphysical contention can best be tested by considering whether an omission, viz., a failure to act, may be thought to furnish the minimum contact with that state that is needed to confer jurisdiction. It seems clear that it could not be. The whole thrust of plaintiff's claim is that there was no contact at all.

*Id.* at 1023–24.

As in *Chlebda*, Pettengill attempts to transform a failure to act that was directed nowhere in particular into a purposeful

availment of the laws of one specific state, Massachusetts. If the Individual Defendants are subject to personal jurisdiction in Massachusetts, they are subject to personal jurisdiction everywhere. Such a conclusion would eviscerate the minimum contacts test for satisfying the requirements of due process. Therefore, the Individual Defendants cannot be subjected to personal jurisdiction based on their allegedly negligent failures to act.

██ As to Ernst's communications with Massachusetts scout leaders, even assuming they can be imputed to Park and Anglim, Pettengill has not made the required prima facie showing of a causal relationship between those letters and the injuries he suffered. As the First Circuit has explained:

> The evidence produced to support specific jurisdiction must show that the cause of action either arises directly out of, or is related to, the defendant's forum-based contacts. The relatedness inquiry is not an open door; it is closely read, and it requires a showing of a material connection. This court "steadfastly reject[s] the exercise of personal jurisdiction whenever the connection between the cause of action and the defendant's forum-state contacts seems attenuated and indirect." "Instead, the defendant's in-state conduct must form an 'important, or [at least] material, element of proof' in the plaintiff's case."

*Harlow*, 432 F.3d at 60–61 (citations omitted).

This standard is not met with regard to the Individual Defendants. This case does not arise out of Ernst's letters to Massachusetts. Nor has any evidence been proffered that Pettengill's claims are related, in the sense of being materially connected, to that correspondence. Pettengill does not proffer any evidence that the Individual Defendants knew about or investigated

abuse by Curtis. Thus, there is no causal link between the correspondence and Pettengill's injury.

However, even if evidence of such correspondence were proffered, it would not constitute an act by which the Individual Defendants purposefully availed themselves of the laws and protections of Massachusetts. In *LaVallee v. Parrot–Ice Drink Prods. of Am., Inc.*, 193 F.Supp.2d 296, 300–302 (D.Mass.2002), the court applied "agency principles" to find personal jurisdiction over a corporation, but not its employee, when the employee made allegedly fraudulent misrepresentations in Massachusetts by mail and electronic means. *Id.* at 302. The court distinguished *Calder v. Jones*, 465 U.S. 783, 789–90, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), in which the Supreme Court held that California could assert personal jurisdiction over a newspaper reporter and editor who had written and edited an allegedly libelous article about a California entertainer. The defendants in *Calder* were "primary participants in the alleged wrongdoing," *id.* at 790, 104 S.Ct. 1482, their activities were "intentionally and independently directed at [California, and] they derived a direct benefit from the publication of the article" because of the attendant publicity. *LaVallee*, 193 F.Supp.2d at 301. In contrast, in *LaVallee* the court found that the employee, who conveyed several statements to the plaintiff in Massachusetts by telephone and fax, acted solely as the agent of his employer because he was "alleged neither to have derived any personal benefit from his contacts in the Commonwealth nor to have acted beyond the scope of his employment." *Id.* at 302. The court in *M–R Logistics, LLC v. Riverside Rail, LLC*, 537 F.Supp.2d 269, 279–80 (D.Mass.2008), engaged in a similar analysis and reached the same conclusion. It found no personal jurisdiction over a member and an agent of

a limited liability corporation who were not alleged to have benefitted personally or acted outside the scope of their employment. *Id.* This court finds this analysis persuasive.

In the instant case, there is no evidence that the Individual Defendants acted outside the scope of their employment or secured any individual benefit due to their activities. Thus, any exercise of jurisdiction based on the activities alleged would essentially be predicated on BSA's contacts with Massachusetts, and that is not sufficient. *See LaVallee,* 193 F.Supp.2d at 301; *LaForest v. Ameriquest Mortgage,* 383 F.Supp.2d 278, 284–85 (D.Mass.2005); *Morris v. UNUM Life Ins. Co. of Am.,* 66 Mass.App.Ct. 716, 720–21, 850 N.E.2d 597 (2006).

Assuming, without necessarily agreeing that it is correct, the reasoning of *Curley v. N. Am. Man Boy Love Assoc.,* 2003 WL 21696547 (D.Mass. March 31, 2003), does not alter this conclusion. In *Curley,* it was alleged that Charles Jaynes, a member of the North American Man–Boy Love Association, ("NAMBLA"), an organization that promoted consensual relationships between grown men and young boys, abducted and killed the plaintiffs' son. *Id.* at *1. The plaintiffs sued both NAMBLA and individuals associated with NAMBLA. *See id.* at *6–*11. The court found that under Massachusetts law, as an unincorporated association, NAMBLA was "not a separate entity and [could] not be a party to litigation." *Id.* at *4. It further held that the members of "NAMBLA's national Steering Committee[ ], a group which purposefully directed NAMBLA's outreach activities generally and, in particular, purposefully directed those activities into Massachusetts," had sufficiently directed NAMBLA's activities at Massachusetts to support personal jurisdiction over them individually. *Id.* at *6. More specifically, the

court found that they had "controlled or substantially influenced" the activities of three Massachusetts residents, who published a newsletter and a magazine and engaged in commercial endeavors from Massachusetts on behalf of a corporation whose funds and officers were commingled with those of NAMBLA. *Id.* at *6–*7. Two individuals, Robert Schwartz and Walter Bieder, were found subject to personal jurisdiction solely because they had been on NAMBLA's Steering Committee. *Id.* at *11. On the other hand, no personal jurisdiction was found over Max Hunter, who contributed short stories and a book excerpt to the NAMBLA newsletter published from or in Massachusetts, but was not a member of the Steering Committee and, therefore, did not "help[ ] to control and direct the actions of" individuals in Massachusetts. *Id.* at *9.

Thus, the basis for jurisdiction in *Curley* was that the individual defendants were not agents of NAMBLA, which as an unincorporated association was not a separate entity that could be sued. *Id.* at *4. Rather, NAMBLA was only an informal vehicle for the individual defendants' personal activities conducted through agents in Massachusetts. Therefore, those activities created personal jurisdiction over the defendants individually in Massachusetts.

The court recognizes that at times "it has been held that "active and entrepreneurial or managerial conduct *in the State* where jurisdiction is asserted will cause jurisdiction to attach." " *Kleinerman v. Morse,* 26 Mass.App.Ct. 819, 824, 533 N.E.2d 221 (1989) (emphasis added). In *Kleinerman,* a motion to dismiss for lack of personal jurisdiction by the president of a company who personally engaged in many activities in Massachusetts was properly denied because it was "premature at the outset to assume that [he] was at all times acting in the capacity of an agent."

*Id.* at 825, 533 N.E.2d 221. However, lower level officers with more limited activities in Massachusetts were found not to have availed themselves purposefully of the privilege of conducting business in the forum and were dismissed. *Id.*

In the instant case, the proffered evidence does not cast into doubt that the Individual Defendants were acting solely as agents of the BSA. That evidence indicates only that Ernst was essentially a conduit for information to be placed in the confidential files. Therefore, asserting personal jurisdiction over the Individual Defendants would not comport with the requirements of due process. *See LaVallee, supra; M–R Logistics LLC, supra; LaForest, supra.*

### D. *Jurisdictional Discovery*

■ In a footnote to his opposition to the Individual Defendants' motions to dismiss, Pettengill requests "limited jurisdictional discovery" "[i]f the Court determines that additional evidence is necessary." Pl. Consol. Opp. to Mots. to Dismiss at 2 n. 2. A court has discretion to permit jurisdictional discovery if a plaintiff puts forth a colorable claim of personal jurisdiction and "present[s] facts to the court which show why jurisdiction would be found if discovery were permitted." *United States v. Swiss Am. Bank, Ltd.,* 274 F.3d 610, 626 (1st Cir.2001). However, "[f]ailure to allege specific contacts, relevant to establishing personal jurisdiction, in a jurisdictional discovery request can be fatal to that request." *Id.* at 626–27.

■ Pettengill has not made a colorable claim that personal jurisdiction would be proper under the standard described in *LaVallee,* 193 F.Supp.2d at 300, because he does not suggest that the Individual Defendants acted outside the scope of their employment or for their own benefit. Nor has Pettengill presented a colorable

claim that the Individual Defendants committed any acts, as distinct from omissions, that are sufficiently causally linked to his injuries to satisfy due process. *See Chlebda,* 609 F.2d at 1023–24; *Harlow,* 432 F.3d at 60–61.

Pettengill also has not stated what specific evidence he expects he would find in discovery that would establish that personal jurisdiction over the Individual Defendants exists. *See id.* at 626–27. The only items Pettengill indicates he has sought or would seek relating to personal jurisdiction are "news advisories" from BSA of the same type as others he has offered that relate to sexual abuse in Massachusetts. *See* Pl. Consol. Opp. to Mots. to Dismiss at 21 n. 17. As explained previously, such advisories issued by BSA would not be sufficient to create personal jurisdiction. *See LaVallee,* 193 F.Supp.2d at 301; *Morris,* 66 Mass.App.Ct. at 720–21, 850 N.E.2d 597. In the absence of specific allegations that might give rise to personal jurisdiction, Pettengill has not satisfied his burden to justify jurisdictional discovery. Therefore, his request for jurisdictional discovery is being denied.

However, Pettengill will be getting discovery in the course of this case from the BSA. If that discovery develops evidence demonstrating personal jurisdiction exists in Massachusetts over any or all of the Individual Defendants, Pettengill may move to have them added as parties again. See *Kleinerman,* 26 Mass.App.Ct. at 825, 533 N.E.2d 221.

### IV. CITY OF HAVERHILL

Haverhill asserts a number of defenses to the action in its motion to dismiss. It argues that all three claims against it are barred by the statutes of limitations. It also contends that Count 6, alleging sexual harassment, is similarly barred by failure to file a timely complaint with the Massachusetts Commission Against Discrimina-

tion ("MCAD"), and that Count 7, alleging negligence, and Count 8, alleging negligent infliction of emotional distress, are barred by the failure to make timely presentment to Haverhill. In addition, Haverhill contends that the Count 7 negligence claim is barred by a provision of the Massachusetts Tort Claims Act ("MTCA") preserving immunity against "any claim based on an act or failure to act to prevent or diminish the harmful consequences of a condition or situation ... not originally caused by the public employer." Mass. Gen. Laws ch. 258 § 10(j). Finally, Haverhill asserts that the Count 8 claim for negligent infliction of emotional distress is barred because Curtis was not acting within the scope of his employment while molesting Pettengill, and also because the Worker's Compensation program is his exclusive remedy for the on-the-job psychological injuries he allegedly suffered.

In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court must "take all factual allegations as true and [ ] draw all *reasonable* inferences in favor of the plaintiff." *Rodriguez–Ortiz v. Margo Caribe, Inc.*, 490 F.3d 92, 96 (1st Cir.2007) (emphasis in original). The court must "neither weigh[ ] the evidence nor rule[ ] on the merits because the issue is not whether the plaintiffs will ultimately prevail, but whether they are entitled to offer evidence to support their claims." *Day v. Fallon Cmty. Health Plan, Inc.*, 917 F.Supp. 72, 75 (D.Mass.1996). A motion to dismiss should be denied if a plaintiff has shown "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1967, 167 L.Ed.2d 929 (2007).

A. *Timeliness*

1. *Negligence Claims (Mass. Tort Claims Act)*

The parties agree that Pettengill's negligence claims against Haverhill as a public employer are governed by the MTCA, Mass. Gen. Laws ch. 258. The MTCA is a limited waiver of sovereign immunity, and tort claims that do not fit within its terms are barred. *See Sharon v. City of Newton*, 437 Mass. 99, 111, 769 N.E.2d 738 (2002). There are two issues of timeliness relating to an MTCA claim. First, a plaintiff must present a negligence claim in writing to the public employer "within two years after the date upon which the cause of action arose." Mass. Gen. Laws ch. 258, § 4. Second, a plaintiff must commence an action within "three years after the date upon which [the] cause of action accrued." *Id.*

Since it has been almost twenty years since the alleged abuse of Pettengill by Curtis ended, Pettengill's claims would ordinarily be time-barred. However, the "discovery rule" applies to the statute of limitations for negligence in sexual abuse cases. Under the discovery rule, the limitations period does not begin to run "until a plaintiff has first, an awareness of [his] injuries and, second, an awareness that the defendant caused [his] injuries." *Doe v. Creighton*, 439 Mass. 281, 283, 786 N.E.2d 1211 (2003). A plaintiff claiming that he did not recognize the cause of his injuries bears the burden of "proving both an actual lack of causal knowledge and the objective reasonableness of that lack of knowledge." *Id.* The objective standard refers to "a reasonable person who has been subjected to the conduct which forms the basis for the plaintiff's complaint." *Riley v. Presnell*, 409 Mass. 239, 245, 565 N.E.2d 780 (1991).

The discovery rule also applies to the presentment period because it counts from when a cause of action arose. *See Heck v. Commonwealth*, 397 Mass. 336, 340, 491 N.E.2d 613 (1986) (suggesting, in dicta,

that discovery rule should be applied to presentment in medical malpractice actions under MTCA); *Krasnow v. Allen,* 29 Mass.App.Ct. 562, 567, 562 N.E.2d 1375 (1990) ("The discovery rule, however, is applicable to the presentment requirement."). Since Pettengill alleges that he made presentment and commenced the action less than two years after he became aware of his injury or its cause, the timeliness of the presentment merges with the statute of limitations issue. If the discovery rule tolls the statute of limitations, it also tolls the presentment requirement.

Haverhill argues that Pettengill's purported lack of knowledge that Curtis's abuse caused his injuries is objectively unreasonable. It claims that the factors cited in *Doe* and in *Koe v. Mercer,* 450 Mass. 97, 103, 876 N.E.2d 831 (2007), including the plaintiff's age at the time of abuse, the proximity of abuse to when the plaintiff turned eighteen, the defendant's attempts to disguise the abuse, and the proximity of the abuse to the manifestation of plaintiff's injuries, all weigh against Pettengill. In both *Doe* and *Koe,* the Supreme Judicial Court held that a delay in filing suit was unreasonable when a plaintiff experienced psychological harms or exhibited bad behavior close in time to the start of the abusive conduct. *See Koe,* 450 Mass. at 103–05, 876 N.E.2d 831; *Doe,* 439 Mass. at 285, 786 N.E.2d 1211. Haverhill characterizes these findings as a retreat from *Ross v. Garabedian,* 433 Mass. 360, 742 N.E.2d 1046 (2001), in which the plaintiff was allowed to proceed on his claim, nearly 30 years after the abuse started, when he was abused from age 13 to age 15, and his psychological injuries did not manifest until seven years after the abuse ended. *Id.* at 361, 742 N.E.2d 1046. Although the Supreme Judicial Court has stated that "[t]he *Ross* case represents the outer boundaries of the discovery rule," *Doe,* 439 Mass. at 286–87, 786 N.E.2d 1211, Haver-

hill does not claim that either *Doe* or *Koe* overruled *Ross.*

■ Importantly, whether a failure to understand causation is objectively reasonable is generally an issue of fact. *See Taygeta Corp. v. Varian Assoc., Inc.,* 436 Mass. 217, 229, 763 N.E.2d 1053 (2002) ("In most instances, the question when a plaintiff knew or should have known of its cause of action is one of fact that will be decided by the trier of fact."); *Riley,* 409 Mass. at 244–48, 565 N.E.2d 780 (reversing summary judgment in sexual abuse case where plaintiff presented expert evidence that reasonable person who had been abused as he had would not necessarily connect psychological injuries with abuse). The test of reasonableness for the discovery rule is objective but nonetheless fact-specific, as it relies not on a reasonable person who had not been abused, for whom 20 years may be unreasonable, but on one in the plaintiff's position. *See Riley,* 409 Mass. at 245, 565 N.E.2d 780.

■ Construed in the light most favorable to Pettengill, the complaint alleges that Pettengill's psychological injuries were such that he believed his relationship with Curtis to be normal, and only much later realized that it was abusive and had caused him significant psychological injury. This is just the sort of argument that the Supreme Judicial Court accepted in *Ross* and *Riley. See Ross,* 433 Mass. at 363–66, 742 N.E.2d 1046 (vacating summary judgment for defendant because "[t]he record unequivocally indicate[d]" that plaintiff had not made causal link and evidence on reasonableness was inconclusive); *Riley,* 409 Mass. at 243–47, 565 N.E.2d 780 (reversing summary judgment for defendant because evidence was ambiguous as to plaintiff's ability to make causal link). Neither *Doe* nor *Koe* was decided on a motion to dismiss. Both had factual discovery before a

determination on the statute of limitations was made on a motion for summary judgment. *See Doe,* 439 Mass. at 281, 285–86, 786 N.E.2d 1211; *Koe,* 450 Mass. at 98, 102–106, 876 N.E.2d 831. The questions of fact involved in the instant case cannot properly be resolved on a motion to dismiss. Therefore, Haverhill's motion to dismiss the negligence claims in Counts 7 and 8 based on the statute of limitations is being denied.

### 2. *Sexual Harassment (Ch. 151B)*

■■■■ An employment discrimination/sexual harassment claim also has two distinct timing elements. First, an aggrieved person must file a complaint with the MCAD "within 6 months after the alleged act of discrimination." Mass. Gen. Laws ch. 151B, § 5.[3] Second, after filing an MCAD complaint and either waiting 90 days or receiving a right-to-sue letter from a commissioner, the plaintiff must file an action "not later than three years after the alleged unlawful practice occurred." Mass. Gen. Laws ch. 151B, § 9. The MCAD, through its regulations, has relaxed the timing requirements for the complaint "where facts are alleged which indicate that the unlawful conduct complained of is of a continuing nature," as with a hostile work environment claim. 804 C.M.R. 1.10(2); *see also Cuddyer v. Stop & Shop Supermarket Co.,* 434 Mass. 521, 531–32, 750 N.E.2d 928 (2001). However, the continuing violation doctrine is only applicable if "there is a discrete violation within the six-month limitations period to anchor the earlier claims." *Cuddyer,* 434 Mass. at 532, 750 N.E.2d 928. In this case there is no allegation of any abuse in 2006 or 2007, so there is no alleged continuing violation.

The minority tolling provision, which tolls most statutes of limitations for a minor until he reaches the age of eighteen, applies to both the MCAD complaint period and the statute of limitations, so each should be counted from Pettengill's eighteenth birthday in approximately 1991. *See* Mass. Gen. Laws ch. 260, § 7; *Bills v. Boby's Food Enterprises Inc.,* 1998 WL 1184157, *1–2 (Mass.Super.Ct. Feb. 5, 1998). Thus, absent the operation of a discovery rule, Pettengill was required to have filed a complaint with the MCAD by 1992, and a lawsuit by 1994. He alleges that he filed an MCAD complaint on November 7, 2006, and his initial complaint was filed in Essex Superior Court on September 20, 2007.

In *Silvestris v. Tantasqua Reg'l Sch. Dist.,* 446 Mass. 756, 766, 847 N.E.2d 328 (2006), the court applied the discovery rule to a ch. 151B claim. In *Silvestris,* female teachers alleged that men received greater credit for their previous work experience and, as a consequence, received greater pay than similarly situated women. 446 Mass. at 760–64, 847 N.E.2d 328. The plaintiffs alleged that they did not suspect the disparity until a male teacher was hired to a similar position at a higher pay grade. *Id.* at 763–64, 847 N.E.2d 328. The court discussed the discovery rule in general and found that "the date when the plaintiffs had reason to know that they had been harmed by the school district's conduct [was] when the six-month statute of limitations began to run on their claims." *Id.* at 768, 847 N.E.2d 328. *See also Wheatley v. Am. Tel. & Tel. Co.,* 418 Mass. 394, 397–99, 636 N.E.2d 265 (1994) (holding that, in age discrimination case, six-month period did not run until terminated

---

**3.** In 2004, the statute was amended to extend the relevant period to 300 days. It is not material which time limit applies.

plaintiff became aware that his duties were transferred to younger employees).

The terms of the limitations provision in ch. 151B are different from those in the MTCA. The MTCA statute of limitations refers to when the cause of action "arose" or "accrued." Mass. Gen. Laws ch. 258, § 4. In contrast, the statute of limitations for ch. 151B runs from "the alleged act of discrimination" and when "the alleged unlawful practice occurred." Mass. Gen. Laws ch. 151B, §§ 5, 9. The Appeals Court construed the language of ch. 151B by stating: "The limitation runs from the time of *occurrence* of the act of discrimination." *Sereni v. Star Sportswear Mfg. Corp.*, 24 Mass.App.Ct. 428, 430, 509 N.E.2d 1203 (1987) (emphasis in original). It is not clear from the language of ch. 151B that a discovery rule should apply to it. However, *Silvestris* applied a discovery rule in a ch. 151B action. *See* 446 Mass. at 768, 847 N.E.2d 328. Therefore, the court understands that such a rule is applicable in the instant case.

▮ Nevertheless, the statute of limitations bars Pettengill's ch. 151B claim because the injury relevant to a ch. 151B claim, unlike his other claims, is tied specifically to the workplace, and his injury must have occurred there. The statute defines sexual harassment as:

> sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when (a) submission to or rejection of such advances, requests or conduct is made either explicitly or implicitly a term or condition of employment or as a basis for employment decisions; (b) such advances, requests or conduct have the purpose or effect of unreasonably interfering with an individual's work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment.

Mass. Gen. Laws ch. 151B, § 1(18). The complaint does not allege that the sexual advances were a term or condition of employment, but that "[the] unwelcome conduct of a sexual nature [ ] unreasonably interfered with Pettengill's work performance.... Curtis's conduct created an intimidating, hostile, humiliating or sexually offensive work environment for Pettengill." Am. Compl. ¶¶ 119–120. If Pettengill was aware that he was being harassed when the alleged harassment occurred, his claim is untimely because he "discovered" the harassment while he was still working at the Library. *See Silvestris,* 446 Mass. at 768, 847 N.E.2d 328 (statute of limitations begins to run when plaintiff has reason to know he has been harmed by defendant's conduct).

However, if Pettengill was unaware that he was being harassed at the time he worked at the Library, Curtis's conduct could not have interfered with Pettengill's work performance or created a hostile work environment. While it is certainly possible that sexual abuse may create psychological injuries manifesting later in life, it is not possible for conduct that is not regarded by the victim as offensive at the time to create, retroactively, a hostile work environment. As described earlier, in this case, Pettengill alleges that during the time he worked in the Library, Curtis had caused him to believe that their sexual relationship was normal and natural. Pettengill did not realize until many years later that the relationship was really abusive and offensive. Therefore, even if the facts Pettengill alleges are proven, they would be insufficient to prove that Curtis's sexual harassment unreasonably interfered with Pettengill's ability to work at the Library or created a hostile work environment.

▮ Pettengill argues in the alternative that equitable tolling is appropriate.

See *Christo v. Edward G. Boyle Ins. Agency, Inc.*, 402 Mass. 815, 817, 525 N.E.2d 643 (1988) (ch. 151B limitations period subject to equitable tolling). Equitable tolling is generally applicable "in circumstances in which the plaintiff is excusably ignorant about the six-month statutory filing period, or where the defendant or the MCAD has affirmatively misled the plaintiff." *Andrews v. Arkwright Mut. Ins. Co.*, 423 Mass. 1021, 1022, 673 N.E.2d 40 (1996) (citations omitted). The limitations period for sexual harassment has been found to have been tolled when the potential defendant lulled the potential plaintiff into inaction. *See Christo*, 402 Mass. at 817–19, 525 N.E.2d 643. Mental disability could also toll the limitations period if it renders the plaintiff insane by "preclud[ing] the plaintiff's understanding the nature or effects of his acts." *Cherella v. Phoenix Technologies, Ltd.*, 32 Mass.App.Ct. 919, 920, 586 N.E.2d 29 (1992) (quotation and citation omitted).

While Pettengill could argue that Curtis lulled him into inaction, he has made no such claim concerning Haverhill. Pettengill claims to have misunderstood past events, but he does not allege that he was insane in the sense of *Cherella*. Therefore, Pettengill has not alleged facts that, if proven, would justify a finding of equitable tolling against Haverhill. *Cf. Chico-Velez v. Roche Prods.*, 139 F.3d 56, 58–59 (1st Cir.1998) ("Federal courts should not apply equitable tolling liberally to extend time limitations in discrimination cases.... In a nutshell, equitable tolling is reserved for exceptional cases."); *Deo-Agbasi v. Parthenon Group*, 229 F.R.D. 348, 354 (D.Mass.2005) (declining to apply equitable tolling when action was filed late due to attorney's neglect and noting First Circuit's admonition to use it sparingly in discrimination cases).

### B. MTCA Immunity

■ Haverhill further argues that Count 7, which it characterizes as a negligent supervision claim, is barred by a provision of the MTCA that immunizes a public employer from "any claim based on an act or failure to act to prevent or diminish the harmful consequences of a condition or situation, including the violent or tortious conduct of a third person, which is not originally caused by the public employer." Mass. Gen. Laws ch. 258 § 10(j). A public employer only causes a condition or situation by an affirmative act that "materially contributed to creating the specific 'condition or situation' that resulted in the harm." *Kent v. Commonwealth*, 437 Mass. 312, 319, 771 N.E.2d 770 (2002). A claim that Haverhill negligently trained or supervised Curtis would be a "claim[ ] based on the failure to prevent or mitigate a harm, rather than participation in the initial injury-causing circumstance." *Armstrong v. Lamy*, 938 F.Supp. 1018, 1044 (D.Mass.1996).

■ However, Pettengill seeks to recover for the negligent actions of at least one City of Haverhill employee in first hiring and later promoting Curtis to a position in which he had increased autonomy, thus allegedly exposing Pettengill to an increased risk of abuse. The application of the MTCA to negligent hiring and promotion in this case is distinct from its application to negligent supervision. In *Armstrong*, the plaintiff asserted, among others, claims for negligent supervision and negligent hiring of a teacher who allegedly sexually abused him. The court found that the former was barred by § 10(j) while the latter was not. *See Armstrong*, 938 F.Supp. at 1043–46. More specifically, it was held that negligent supervision did not involve anything more than the failure to alleviate or respond to a private harm, but the school committee

took an affirmative act in hiring the teacher that could have subjected them to liability had there been any evidence that they failed to exercise due care. *Id.*

Similarly, in *Bonnie W. v. Commonwealth,* 419 Mass. 122, 125–26, 643 N.E.2d 424 (1994), the plaintiff was assaulted by a parolee, and the plaintiff asserted two theories of negligence: that the parole officer negligently supervised the parolee by, among other things, failing to meet with him, and that the parole officer "contributed to the plaintiff's injury by negligently recommending [the parolee's] continued employment . . . and misrepresenting [his] criminal history [to an employer]." *Id.* at 126, 643 N.E.2d 424. The court noted that the former theory was "no longer viable" after the passage of § 10(j), while the latter was not barred because it alleged affirmative actions by the public employee. *Id.* at 126–27, 643 N.E.2d 424.

In addition, the Supreme Judicial Court cited *Doe v. Blandford,* 402 Mass. 831, 525 N.E.2d 403 (1988), which predated § 10(j), as "illustrative of the relationship between affirmative acts and specific conditions or situations" that would cause an action not to be barred under § 10(j). *Kent,* 437 Mass. at 319 n. 9, 771 N.E.2d 770. In *Blandford,* the plaintiff alleged among other things that a school district negligently hired a middle school guidance counselor who had previously been placed on probation for assault and battery of a student at another school where he was a guidance counselor, and he subsequently engaged in indecent assault and battery on the plaintiff. *See Blandford,* 402 Mass. at 832–33, 525 N.E.2d 403.

This case is analogous to *Armstrong, Bonnie W.,* and *Blandford.* A claim merely for negligent supervision would be barred. However, Pettengill alleges that Haverhill negligently hired and promoted Curtis, actions that one or more employees of Haverhill took and that "materially contributed" to Curtis being in charge of teenage boys at the Library and gaining increased autonomy. *See Kent,* 437 Mass. at 319, 771 N.E.2d 770. If Pettengill can prove that Haverhill negligently hired Curtis, it may have "originally caused" the situation and, therefore, it would not be immune from suit pursuant to § 10(j). Similarly, if negligent promotion of Curtis by Haverhill created a new risk by giving Curtis more autonomy, that too would make Haverhill the "original cause" of Pettengill's injuries. In addition, these theories of negligence against Haverhill make it irrelevant that Curtis was not acting within the scope of his employment when he allegedly abused Pettengill. Therefore, Haverhill's motion to dismiss Count 7 on this basis is being denied.

### C. *Workers' Compensation Exclusivity*

■ Haverhill further contends that Count 8, the claim for negligent infliction of emotional distress, is barred by the exclusivity provision of the Workers' Compensation Act, and recovery under the Workers' Compensation system should be Pettengill's only remedy for that alleged injury. Under Massachusetts law, unless the employee gave written notice of his intent to retain his common-law rights, claims for emotional distress are barred if the injuries arise "out of and in the course of employment." *Green v. Wyman–Gordon Co.,* 422 Mass. 551, 558, 664 N.E.2d 808 (1996) (quotation omitted); Mass. Gen. Laws ch. 152, §§ 24, 26. Pettengill does not allege having given such written notice. Haverhill argues that, since Count 6 contends that Curtis's actions constituted sexual harassment in the workplace, Pettengill's injury must have been in the course of employment and, therefore, compensable under the Workers' Compensation system.

However, the question of whether the emotional injuries arose out of and in the course of employment is an issue of fact. *See In re Hicks's Case,* 62 Mass.App.Ct. 755, 762, 820 N.E.2d 826 (2005). "An injury arises out of the employment if it arises out of the nature, conditions, obligations or incidents of the employment; in other words, out of the employment looked at in any of its aspects." *Caswell's Case,* 305 Mass. 500, 502, 26 N.E.2d 328 (1940) (quoted in *Hicks,* 62 Mass.App.Ct. at 763, 820 N.E.2d 826). Injuries do not arise out of employment if an employee is engaged in purely personal activity on the employer's premises, but only if he is "occupying himself consistently with his contract of hire in some manner pertaining to or incidental to his employment." *Souza's Case,* 316 Mass. 332, 335, 55 N.E.2d 611 (1944) (quoted in *Hicks,* 62 Mass.App.Ct. at 763, 820 N.E.2d 826); *see also Ritchie's Case,* 351 Mass. 495, 496, 222 N.E.2d 687 (1966) (injury did not arise from employment when employee fell while reaching to pet a cat). Under this standard, Pettengill's activities while he was allegedly being abused were not consistent with or related to his terms of employment, but instead purely personal. *See Hicks,* 62 Mass.App.Ct. at 763, 820 N.E.2d 826. Just as abusing employees was outside the scope of Curtis's employment, engaging in sexual activity was unrelated to Pettengill's duties at the Library.

Pettengill also asserts that he was abused at the Library by Curtis both while Pettengill was an employee and at times when he was not employed there. *See* Am. Compl. ¶ 80. When Pettengill was not an employee of Haverhill, he was not covered by Workers' Compensation and, therefore, had surrendered none of his common-law rights. Thus, at a minimum, the Workers' Compensation statute does not require dismissal of Count 8 in its entirety. Accordingly, the motion to dismiss on this basis is being denied.

## V. ORDER

For the foregoing reasons, it is hereby ORDERED that:

1. The Individual Defendants' Motions to Dismiss (Docket Nos. 22, 23, and 24) are ALLOWED and this case is DISMISSED as against Paul Ernst, Joseph Anglim, and David Park for lack of personal jurisdiction.

2. Haverhill's Motion to Dismiss (Docket No. 11) is ALLOWED as to Count 6 and otherwise DENIED.

3. All remaining parties shall comply with the August 13, 2008 Scheduling Order (Docket No. 37).