SATURN MANAGEMENT LLC, Saturn Partners Limited Partnership II, and Jeffrey S. McCormick, Plaintiffs,

v.

GEM–ATREUS ADVISORS, LLC, Arun Ganguly, Arup Ganguly Charitable Trust, and Ganguly Technology Ventures, LLC, Defendants.

Civil Action No. 10–10485–WGY.

United States District Court, D. Massachusetts.

Dec. 9, 2010.

Azure M. Abuirmeileh, Michael A. Collora, Jeffrey S. McCormick, Amy B. Auth, Dwyer & Collora, LLP, Boston, MA, for Arup Ganguly Charitable Trust (Defendant).

Terence K. Ankner, Peter C. Horstmann, Law Offices of Partridge, Ankner & Horstmann, LLP, Boston, MA, for Saturn Management LLC (Plaintiff).

---

## MEMORANDUM AND ORDER

YOUNG, D.J.

## I. INTRODUCTION

On March 22, 2010, the plaintiffs Saturn Management LLC ("Saturn"), Saturn Partners Limited Partnership II ("SPLP II") (collectively, "Saturn Entities"), and Jeffrey McCormick ("McCormick") filed a complaint against GEM–Atreus Advisors, LLC ("GEM–Atreus"), Arun Ganguly ("Ganguly"), Arup Ganguly Charitable Trust ("Ganguly Trust"), and Ganguly Technology Ventures, LLC ("Ganguly Ventures"). Compl., ECF No. 1. The complaint includes claims of breach of contract, fraud, and violation of Massachusetts General Laws Chapter 93A against each of the defendants.

On July 19, 2010, GEM–Atreus and Ganguly filed a motion to dismiss or stay proceedings and compel arbitration. Mot. Dismiss or Stay Proceedings and Compel Arbitration ("GEM–Atreus and Ganguly's

Mot. Dismiss"), ECF No. 14. On the same date, Ganguly Trust and Ganguly Ventures (collectively, "Ganguly Trust and Ventures") filed a motion to dismiss for lack of personal jurisdiction and failure to state a claim upon which relief can be granted. Mot. Dismiss ("Ganguly Trust and Ventures' Mot. Dismiss"), ECF No. 16.

At an oral hearing on September 22, 2010, this Court granted GEM–Atreus and Ganguly's motion to compel arbitration, and the case as to those defendants was administratively closed. This Court took under advisement Ganguly Trust and Ventures' motion to dismiss for lack of personal jurisdiction.

## II. FACTUAL BACKGROUND

On or about March 4, 2008, Saturn, represented by McCormick, entered into an agreement (the "Engagement Letter") with GEM–Atreus. Compl. ¶ 11. GEM–Atreus was represented by its managing director, Ganguly, who was to act as a non-exclusive financial advisor to Saturn. *Id.* ¶ 12. These financial advisory services were to include the identification and introduction of prospective investors for SPLP II. *Id.* ¶ 13. In exchange, Saturn was to pay a monthly retainer of $8,000.00, all of which was to be repaid to Saturn if GEM–Atreus failed to raise any money for SPLP II. *Id.* ¶ 12. Saturn paid $66,000.00 in retainer fees to GEM–Atreus. *Id.* GEM–Atreus, however, allegedly raised no money for SPLP II. Aff. Jeffrey McCormick ("McCormick Aff.") ¶ 18, ECF No. 21–8. Nevertheless, immediately upon signing the Engagement Letter, Ganguly began using Saturn's American Express credit card, without preapproval,[1] for his

---

1. The Engagement Letter imposed a duty upon GEM–Atreus and Ganguly to have all out of pocket expenses preapproved by Saturn:

> Saturn Management agrees to reimburse GEM–Atreus Advisors with all out of pocket expenses incurred as a result of GEM–Atreus Advisors activities as set forth here-

own personal use. *Id.* ¶ 20. Namely, Ganguly used Saturn's credit card to pay for five-star hotels, chauffeur services, and multiple first-class airfares. *Id.* Ganguly also charged Saturn for expenses he incurred while supposedly traveling on business, but was actually traveling with his mother and fiancée. *Id.* ¶ 21. Consequently, Saturn claims to have expended more than $730,000.00 for travel-related expenses and $370,801.92 for charges made by Ganguly with no business purpose. Compl. ¶¶ 14, 28.

After discovering these charges, Saturn requested immediate reimbursement and reiterated that it would no longer pay non-business expenses. McCormick Aff. ¶ 22. Ganguly agreed to reimburse Saturn for all of his personal expenses. *Id.* ¶ 23. For more than a year, however, Ganguly made excuses and misrepresented his intent to reimburse Saturn, despite its continuous follow-ups. *Id.* ¶ 24.

It was under these circumstances, and only after McCormick expressed Saturn's dissatisfaction, that Ganguly initiated a conversation regarding the possibility of Ganguly Trust and Ventures investing in SPLP II. *Id.* ¶ 27. McCormick was in Boston when this conversation took place. *Id.* On August 27, 2008, Ganguly sent an e-mail to McCormick confirming his commitment to invest $2,000,000.00 in SPLP II. *Id.* ¶ 28.

On September 9, 2008, Ganguly also sent Saturn a letter stating that Ganguly Trust's trustees agreed to invest $1,000,000.00 in SPLP II. *Id.* ¶ 29. Ganguly prepared a memorandum entitled "Update SP II Fundraising" ("Fundraising Memorandum"), dated September 17, 2008. *Id.* ¶ 20. In this Fundraising Memorandum, Ganguly stated that Ganguly

Ventures would invest $2,000,000.00 no later than October 1, 2008, and Ganguly Trust would invest $1,000,000.00 no later than November 1, 2008. *Id.* The schedule attached to the Fundraising Memorandum indicated that there was a 100% chance of each these entities investing such amounts. *Id.* In accordance with the Fundraising Memorandum, Ganguly Trust and Ventures entered into two different agreements (the "Subscription Agreements") with SPLP II, in which they committed to invest a total of $3,000,000.00 in SPLP II. ECF No. 1, Exs. 3, 4. These Subscription Agreements were drafted in Massachusetts, McCormick Aff. ¶ 33, and included the following choice of law and forum selection provision:

> This agreement shall be construed in accordance with, and its validity, construction, and performance shall be governed by, the laws of the State of Delaware without regard to any choice of law doctrine that would require or permit application of the laws of any other jurisdiction. The Subscriber hereby irrevocably consents to the exclusive jurisdiction of any federal or state court sitting in the State of Delaware for purposes of any proceeding relating to this agreement and waives any objection to the convenience of any such court.

Subscription Agreements 6.

Saturn never received any of the promised money. McCormick Aff. ¶ 35. In reliance on the investment promises, SPLP II made other investment commitments in portfolio companies. *Id.* ¶ 36. To honor these commitments, McCormick personally invested an additional $3,000,000.00 in SPLP II. *Id.* ¶ 37. Similarly, Ganguly allegedly misrepresented other investors' intent. *Id.* at ¶ 38. He repeatedly assured McCormick that the

---

in. All expenses will be preapproved by Saturn Management.

Engagement Letter 2, ECF No. 1–1.

Qatar Investment Authority ("Authority") would invest at least $10,000,000.00 in SPLP II. *Id.* ¶¶ 39, 40. When McCormick met with Authority, however, he learned that it never intended to invest in the Saturn Entities. *Id.* ¶ 41.

According to McCormick, Ganguly also regularly scheduled meetings with potential investors around the world, only for McCormick to discover upon arrival at the destination that the meetings had never been arranged. *Id.* ¶ 43. McCormick later found out that Ganguly had stated to other parties that SPLP II was interested in investing with them while representing to SPLP II that those parties were interested in investing in it. *Id.* ¶ 45.

## III. ANALYSIS

### A. Legal Standard

The plaintiffs bear the burden of proving the court's personal jurisdiction over the defendants.[2] *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 50 (1st Cir.2002). The question before this Court is whether the Saturn Entities and McCormick have asserted sufficient facts to establish personal jurisdiction over Ganguly Trust and Ventures.

### B. Personal Jurisdiction Over Ganguly Trust and Ventures

A plaintiff can establish either specific or general jurisdiction over a defendant. *See Harlow v. Children's Hosp.*, 432 F.3d 50, 57 (1st Cir.2005). The plaintiffs do not allege that Ganguly Trust and Ventures had "continuous and systematic contacts" with Massachusetts such that this Court could exercise general jurisdiction over these entities. *See id.* Consequently, the plaintiffs must assert sufficient facts to support the exercise of specific personal jurisdiction over Ganguly Trust and Ventures. "Specific jurisdiction exists when there is a demonstrable nexus between a plaintiff's claims and a defendant's forum-based activities, such as when the litigation itself is founded directly on those activities." *Massachusetts Sch. of Law at Andover, Inc. v. American Bar Ass'n*, 142 F.3d 26, 34 (1st Cir.1998). "[T]o establish personal jurisdiction, [the plaintiffs] must show that 'the Massachusetts long-arm statute grants jurisdiction and, if it does, that the exercise of jurisdiction under the statute is consistent with the Constitution.'" *Hannon v. Beard*, 524 F.3d 275, 280 (1st Cir.2008) (quoting *Daynard*, 290 F.3d at 52).

#### 1. The Massachusetts Long-Arm Statute

▆▆▆ Under the Massachusetts long-arm statute, this Court is authorized to assert "personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's ... transacting any business in [Massachusetts]." Mass. Gen. Laws ch. 223A, § 3. The notion of transacting business is broadly construed and easy to satisfy. See *United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1087 (1st Cir. 1992). A defendant's physical presence in

---

**2.** There are three methods for determining whether a plaintiff has met his burden of establishing personal jurisdiction over a defendant at the motion to dismiss stage: (1) the "prima facie" method; (2) the "preponderance-of-evidence" method; and (3) the "likelihood" method. *Daynard*, 290 F.3d at 51. The most conventional of these methods is the "prima facie" method. *Id.* Both the plaintiffs and the defendants have applied the "prima facie" method. So this Court does so as well. Under the "prima facie" method, a court "consider[s] only whether the plaintiff has proffered evidence that, if credited, is enough to support findings of all facts essential to personal jurisdiction." *Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 675 (1st Cir.1992).

the Commonwealth is not necessary to "transact business" in Massachusetts; rather it is the defendant's "attempt[ ] to participate in the commonwealth's economic life" that counts. *Id.*

■ While it is not true that any communication sent into Massachusetts is sufficient to establish personal jurisdiction, *see M–R Logistics, LLC v. Riverside Rail, LLC,* 537 F.Supp.2d 269, 275 (D.Mass. 2008) (Saylor, J.), just a few such acts may satisfy the long-arm statute, see *Workgroup Tech. Corp. v. MGM Grand Hotel, LLC,* 246 F.Supp.2d 102, 110 (D.Mass.2003) (Collings, M.J.). Typically, "the focus is on the contacts relating to the formation of the contract; those contacts ordinarily must be instrumental to its formation to establish jurisdiction." *M–R Logistics,* 537 F.Supp.2d at 275. "[E]xtensive post-contract communications that relate to the operation of the contract itself" may also be deemed transacting business. *Id.* at 276.

Before Ganguly Trust and Ventures entered into the Subscription Agreements, GEM–Atreus and Ganguly had an ongoing relationship with McCormick and the Saturn Entities. During this ongoing business relationship, Ganguly had repeated contacts with Massachusetts.[3] Concomitantly, Ganguly, acting as Ganguly Trust and Ventures' agent, engaged McCormick and promised to invest $3,000,000.000 in SPLP II. This promise was made to McCormick while he was in Boston. After this initial conversation, Ganguly prepared the Fundraising Memorandum and sent it to McCormick. See Unredacted Emails, ECF No. 21, Ex. 7. Ganguly Trust and Ventures then entered into the Subscription Agreements. These Sub-

scription Agreements were drafted in Massachusetts. Additionally, the defendants had numerous contacts with Massachusetts before and after the signing of the agreements. In fact, the communications between the plaintiffs and Ganguly and Ganguly Trust and Ventures' include hundreds of emails regarding promises of investment. *See* Unredacted Emails, ECF No. 21, Exs. 5–7. Ganguly and Ganguly Trust and Ventures representatives sent these emails to Saturn and SPLP II in Massachusetts. *Id.* These facts suffice to establish Ganguly Trust and Ventures' attempt to participate in Massachusetts's economic life; their contacts thus constitute "transacting business" under the Massachusetts long-arm statute.

■ The long-arm statute also requires that the claim arise from the business transacted in Massachusetts. See Mass. Gen. Laws ch. 223A, § 3. Once again, the "arising from" requirement is generously construed in favor of asserting personal jurisdiction. See *Lyle Richards Int'l, Ltd. v. Ashworth, Inc.,* 132 F.3d 111, 114 (1st Cir.1997). This requirement is met "when the cause of action is for an alleged breach of contract and the business transacted [in Massachusetts] was instrumental in the formation of the contract." *Hahn v. Vermont Law Sch.,* 698 F.2d 48, 51 (1st Cir.1983). Here, Ganguly Trust and Ventures allegedly defrauded and breached their Subscription Agreements with SPLP II by failing to invest the $3,000,000.00 as promised. The Subscription Agreements were created through negotiations that involved the transaction of business in Massachusetts. Thus, this requirement is satisfied.

---

**3.** The parties did not dispute that this Court had personal jurisdiction over Ganguly and GEM–Atreus. Ganguly and GEM–Atreus sent hundreds of e-mails into the Commonwealth,

see Unredacted Emails, ECF No. 21, Exs. 5, 7; and the Engagement Letter contained an arbitration clause referencing arbitration in Massachusetts, Engagement Letter 4.

## 2. Due Process

This Court must next assess whether the exercise of personal jurisdiction over Ganguly Trust and Ventures comports with the constitutional requirements of due process.

"The Due Process Clause requires that 'in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Phillips v. Prairie Eye Ctr.*, 530 F.3d 22, 27 (1st Cir.2008) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319, 66 S.Ct. 154, 90 L.Ed. 95 (1945)) (internal quotation marks omitted). "For specific jurisdiction, the constitutional analysis is divided into three categories: relatedness, purposeful availment, and reasonableness." *Id.* The First Circuit has elaborated on these requirements:

> First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable. Third, the exercise of jurisdiction must ... be reasonable.

*Daynard*, 290 F.3d at 60 (quoting *Foster–Miller, Inc. v. Babcock & Wilcox Can.*, 46 F.3d 138, 144 (1st Cir.1995)).

### a. Relatedness

■ In order to satisfy the relatedness requirement, "[t]he evidence produced to support specific jurisdiction must show that the cause of action either arises directly out of, or is related to, the defendant's forum-based contacts." *Harlow*, 432 F.3d at 60–61. "There must be more than just an attenuated connection between the contacts and the claim; 'the defendant's in-state conduct must form an important, or [at least] material, element of proof in the plaintiff's case.'" *Phillips*, 530 F.3d at 27 (quoting *Harlow*, 432 F.3d at 61) (alteration in original) (internal quotation marks omitted).

Thus, the Saturn Entities must show a sufficient "nexus between the defendant's contacts [with Massachusetts] and the plaintiff's cause of action." *Fairview Mach. & Tool Co. v. Oakbrook Int'l, Inc.*, 56 F.Supp.2d 134, 138 (D.Mass.1999) (Ponsor, J.) (quoting *Ticketmaster–New York, Inc. v. Alioto*, 26 F.3d 201, 206 (1st Cir. 1994)) (internal quotation marks omitted). For the reasons discussed in the analysis of the Massachusetts long-arm statute above, the Saturn Entities' claims satisfy the relatedness requirement.

### b. Purposeful Availment

■ The inquiry into purposeful availment involves consideration of both voluntariness and foreseeability:

> Voluntariness requires that the defendant's contacts with the forum state "proximately result from actions by the defendant *himself.*" The contacts must be deliberate, and "not based on the unilateral actions of another party." Foreseeability requires that the contacts also must be of a nature that the defendant could "reasonably anticipate being haled into court there."

*Phillips*, 530 F.3d at 28 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)); *Adelson v. Hananel*, 510 F.3d 43, 50 (1st Cir.2007). Where a case includes a claim sounding in tort, as here, "the threshold of purposeful availment is lower." *Digital Equip. Corp. v. AltaVista Tech., Inc.*, 960 F.Supp. 456, 469 (D.Mass.1997) (Gertner,

J.); *see also Northeastern Land Servs., Ltd. v. Schulke,* 988 F.Supp. 54, 59 (D.R.I. 1997) (recognizing "the limited relevance of the conventional purposeful availment inquiry in tort actions"). This is so because "[t]he defendant allegedly causing harm in a state may understandably have sought no privileges there; instead the defendant's purpose may be said to be the targeting of the forum state and its residents." *Digital Equip.,* 960 F.Supp. at 469; *see also Thompson Trading Ltd. v. Allied Lyons PLC,* 123 F.R.D. 417, 426 (D.R.I.1989) ("[O]ne committing a tort in a forum does not purposefully avail himself of the benefits and protections of its laws, since such laws are not supporting and protecting his illegal activities. To the contrary, the forum's laws are likely designed to interfere with his tortious conduct.").

Here, Ganguly Trust and Ventures promised to invest $3,000,000.00 in SPLP II, a partnership with its principal place of business in Boston. Ganguly specifically initiated a conversation with McCormick, who was in Boston at that time, about the prospect of Ganguly Trust and Ventures investing in SPLP II. According to the complaint, Ganguly Trust and Ventures made representations to the Saturn Entities which were false and evidenced an intent to defraud. Ganguly Trust and Ventures knew that the effects of their allegedly fraudulent conduct would impact a Boston-based partnership; they voluntarily reached into Massachusetts. Under these present circumstances, although the Subscription Agreements have a choice of law and forum selection provision, the fact remains that Ganguly Trust and Ventures should have reasonably foreseen that they would be asked to defend themselves in Massachusetts.[4] Thus, the purposeful availment prong is satisfied.

#### c. Reasonableness

■ The final step of the personal jurisdiction analysis requires that the exercise of jurisdiction over a specific defendant be reasonable. See *Sawtelle v. Farrell,* 70 F.3d 1381, 1394–96 (1st Cir.1995). To as-

---

**4.** Ganguly Trust and Ventures argue that they did not purposefully avail themselves of the benefits and obligations of the Commonwealth's laws. They mainly rely on *BCCTC Assocs., Inc. v. Summerdale/AAHFI, L.P.,* 656 F.Supp.2d 208 (D.Mass.2009). *BCCTC,* however, can be distinguished from the case at bar. In *BCCTC,* this Court held that the exercise of personal jurisdiction in Massachusetts was improper because the partnership contracts provided for their construction and enforcement in accordance with the laws of the State of Georgia, so it was not foreseeable that the defendants would be haled into court in Massachusetts. Indeed, the acceptance of a choice of law provision in a contract is a factor in the analysis of the purposeful availment prong. But this factor, although persuasive to establish—or refute—the purposeful availment prong, is not determinative. A

Court must still consider the other facts in the complaint.

In *BCCTC,* the complaint involved an alleged breach of partnership agreements, but there were no fraud allegations. Here, in contrast, it is alleged that Ganguly Trust and Ventures acted, from the time their promises were made, with no intention of ever fulfilling those promises. Indeed, Ganguly Trust and Ventures allegedly intentionally acted to defraud SPLP II, Saturn Management, and McCormick. As noted above, where an alleged injury sounds in tort, as it does here, "the threshold of purposeful availment is lower." *Digital Equip.,* 960 F.Supp. at 469. Thus, although the Subscription Agreements have a choice of law and forum provision, Ganguly Trust and Ventures acted in such a way that a reasonable entity would nonetheless have foreseen that it would be asked to defend itself in Massachusetts.

sess reasonableness, the Court must consider several factors:

(1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

*Adelson,* 510 F.3d at 51 (quoting *United Elec.,* 960 F.2d at 1088).

First, Ganguly Trust and Ventures claim that they would be greatly burdened if forced to appear in Massachusetts. They allege that their principal place of business is California, that their key witnesses and documents are located in California, and that they do not have any offices or conduct any business in Massachusetts. For this factor to have significance, however, "the defendant must demonstrate that 'exercise of jurisdiction in the present circumstances is onerous in a special, unusual, or other constitutionally significant way.'" *Nowak v. Tak How Invs., Ltd.,* 94 F.3d 708, 718 (1st Cir.1996) (quoting *Pritzker v. Yari,* 42 F.3d 53, 64 (1st Cir.1994)). Indeed, "staging a defense in a foreign jurisdiction is almost always inconvenient and/or costly...." *Pritzker,* 42 F.3d at 64. Here, the defendants failed to show any unusual burden.

Second, SPLP II is a partnership organized under the laws of Massachusetts, and is mostly comprised of Massachusetts residents. Massachusetts has an interest in resolving disputes involving its partnerships: "[a] State generally has a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state-actors." *Burger King,* 471 U.S. at 473, 105 S.Ct. 2174 (quoting *McGee v. Int'l Life Ins. Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957)).

Third, SPLP II and McCormick have an interest in accessing courts in Massachusetts. Ganguly Trust and Ventures argue that they have no connection whatsoever with Massachusetts and that their key witnesses and documents are located solely in California. Ganguly, however, is a New York resident and thus Boston is geographically a reasonably convenient forum for him. Moreover, the plaintiffs' witnesses and key documents are likely to be in Massachusetts where Saturn, SPLP II, and McCormick will be arbitrating their dispute against GEM–Atreus and Ganguly. The plaintiffs' interest in obtaining effective relief is well served by the exercise of jurisdiction in Massachusetts.

Fourth, the exercise of jurisdiction by this Court serves the "judicial system's interest in obtaining the most effective resolution of the controversy." *Pritzker,* 42 F.3d at 64. The efficient administration of justice favors jurisdiction in Massachusetts, where this action is already proceeding against certain of the defendants. *See Daynard,* 290 F.3d at 62–63.

Fifth, there is no public policy disfavoring the exercise of jurisdiction. The plaintiffs did not engage in inappropriate forum-shopping; they merely filed suit in the state in which they maintain their principal office (SPLP II) and citizenship (McCormick).

Thus, all the factors agitate firmly in favor of exercising jurisdiction over Ganguly Trust and Ventures.

## C. Choice of law and forum selection provision

█ Having established that this Court has personal jurisdiction over Ganguly Trust and Ventures, the Court must address whether the contract's forum selection clause is mandatory, requiring this suit to be brought in Delaware, or permissive, allowing this suit to be brought in Massachusetts.[5]

The forum selection provision in each Subscription Agreement states:

> This Agreement shall be construed in accordance with, and its validity, construction, and performance shall be governed by, the laws of the State of Delaware without regard to any choice of law doctrine that would require or permit application of the laws of any other jurisdiction. The Subscriber hereby irrevocably consents to the exclusive jurisdiction of any federal or state court sitting in the State of Delaware for purposes of any proceeding relating to this Agreement and waives any objection to the convenience of any such court.

Subscription Agreements 7.

The plaintiffs contend that the Subscription Agreements do not exclude the possibility of bringing this case in Massachusetts, but rather provide for the parties' consent to jurisdiction in any federal or state court in Delaware. Pls.' Mem. Opp'n 16–17, ECF No. 21. The defendants, on the other hand, argue that only courts sitting in Delaware can hear this case due to the operation of the forum selection clause. To ascertain the intent of the signatories with respect to the scope of the forum selection clause, it is necessary to consider the specific terms used in the agreement at issue. *See generally Schwanbeck v. Fed.-Mogul Corp.*, 412 Mass. 703, 592 N.E.2d 1289 (1992). Both Subscription Agreements provide that: "[t]he Subscriber hereby irrevocably consents to the exclusive jurisdiction of … Delaware." This phrase has two possible interpretations: (1) it can be read as stating that Delaware courts have "exclusive jurisdiction" for purposes of "any proceeding relating to this Agreement," or (2) it can be read as binding the subscribers, Ganguly Trust and Ventures, to the exclusive jurisdiction of courts in Delaware.

This Court concludes that the phrase in question was intended to mean that "any proceeding related to" the Subscription Agreements would be submitted to the "exclusive jurisdiction" of a court located in Delaware. The language "exclusive jurisdiction" is mandatory, not permissive, and "consented" means that the subscribers agreed with the plaintiffs terms, not that the clause was binding only on the subscribers.

This clause, if considered ambiguous, will be buttressed by a fundamental principle of contract interpretation: an ambiguous contract ought be construed against the drafting party, in this case against the plaintiffs. See *LFC Lessors, Inc. v. Pacific Sewer Maint. Corp.*, 739 F.2d 4, 7–8 (1st Cir.1984). Thus, this court will interpret the provision as stating that courts in Delaware have "exclusive jurisdiction" for purposes of "any proceeding relating to" the Subscription Agreements.

---

**5.** The First Circuit has taken the view that forum selection clauses in diversity actions present an *Erie* question that has not been yet resolved by the Supreme Court. *Lambert v. Kysar*, 983 F.2d 1110, 1116 n. 10 (1st Cir. 1993). Federal courts have long enforced forum selection clauses as matter of federal common law. See *M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 10, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972) (forum selection clauses "are prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances"). Delaware courts apply the *Bremen* reasonableness standard when determining whether to enforce a forum selection clause. See *HealthTrio, Inc. v. Margules*, No. 06C–04–196, 2007 WL 544156, at *3 (Del.Super. Jan. 16, 2007). Hence, "as we discern no material discrepancy between [Delaware] state law and federal law, we need confront neither the choice-of-law issue nor the daunting question whether forum selection clauses are to be treated as substantive or procedural for *Erie* purposes." See *Lambert*, 983 F.2d at 1116.

The plaintiffs contend that forcing them to litigate their claims against Ganguly Trust and Ventures in Delaware while litigating their claims against GEM–Atreus and Ganguly in Massachusetts would "be so gravely difficult and inconvenient that [the] Plaintiffs [would] for all practical purposes be deprived of [their] day in Court." Pls.' Mem. Opp'n 17. As the parties seeking to resist an agreed-to forum selection clause, plaintiffs bear the burden of showing the unreasonableness of enforcement under the circumstances. *M/S Bremen*, 407 U.S. at 10, 92 S.Ct. 1907.

Here, the plaintiffs merely contend that forcing them to litigate their claims against Ganguly Trust and Ganguly Ventures in Delaware, while litigating their claims against GEM–Atreus and Ganguly in Massachusetts would be "gravely difficult and inconvenient." The plaintiffs do not allege any facts in support of this contention, and it alone is not enough to establish the unreasonableness of the forum selection clause. In fact, any possible inconvenience in litigating this case in Delaware was foreseeable to SPLP II and McCormick when they negotiated the Subscription Agreements.

Neither the Saturn Entities nor McCormick alleged any extreme circumstances of grave inconvenience sufficient, in practical effect, to deprive them of their day in court and thus warrant ignoring the freely negotiated forum selection clause. Moreover, as there is complete diversity between the trustees of the Ganguly Trust and the members of the various plaintiff and defendant limited liability corporations, subject matter jurisdiction is as appropriate in Delaware as it is in Massachusetts.

The presence of this forum selection clause does not, of course, deprive this Court of subject matter jurisdiction over this case, nor render venue in Massachusetts improper. See *Silva v. Encyclopedia Britannica, Inc.*, 239 F.3d 385, 388 n. 6 (1st Cir.2001). Accordingly, this Court must consider whether transfer is appropriate under 28 U.S.C. § 1404(a).[6] Here, it is not.

In applying the Section 1404(a) balancing test, the Supreme Court has commanded:

> Section 1404(a) directs a district court to take account of factors other than those that bear solely on the parties' private ordering of their affairs. The district court also must weigh in the balance the convenience of the witnesses and those public-interest factors of systemic integrity and fairness that, in addition to private concerns, come under the heading of "the interest[s] of justice."

*Stewart Org., Inc.*, 487 U.S. at 30, 108 S.Ct. 2239. Here, the forum selection clause is "a significant factor that figures centrally in [this Court's] calculus," *Stewart*, 487 U.S. at 29, 108 S.Ct. 2239, and the selected forum is not unduly inconvenient for the parties. It remains to consider "the interests of justice."

---

**6.** The procedure required [*Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988)] for evaluating forum selection clauses differs sharply from that required in M/S *Bremen* and [*Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991)]. The combined rule of these cases is that a federal court sitting in admiralty jurisdiction should apply a forum selection clause if it is "reasonable," but a federal court sitting in diversity or federal question jurisdiction should take the clause into account only as one element in the balancing test required by Section 1404(a), provided only that the clause does not mandate a state forum.

14D Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3803.1 (3d ed. 2010).

## D. The Interests of Justice

██ While transferring this case to the District of Delaware would be fully appropriate under controlling law, that result is far from satisfactory. McCormick and the Saturn Entities are here in Massachusetts. Ganguly and his entities are in California. Massachusetts counsel represent each of the parties. No one is in Delaware, although the entities all seem to have organized there to gain the advantage of Delaware's laws.

The Saturn Entities must arbitrate their claims against GEM–Atreus and Ganguly here in Massachusetts under this Court's supervision to ensure that arbitration is not an illusory remedy. At the same time, were this Court to transfer the case, the Saturn Entities would have to go to Delaware, engage local counsel, and pursue their claims against Ganguly Trust and Ganguly Ventures in that forum. This, of course, is what the parties bargained for, yet none of them affirmatively has sought a Delaware forum (the Ganguly enterprises merely seek to avoid the Massachusetts forum, not to travel to Delaware), and all agree that such a disposition will markedly increase the parties' expenses and occasion some delay.

The present situation of this case is prototypical of many of the issues confronting civil litigation in federal courts. Many cases seem interminable. The pretrial process has become so elaborate with time-consuming motions, hearings, and discovery that it often seems to have fallen into the hands of some systemic Sorcerer's Apprentice. Yet trials are strikingly infrequent, and, in the unlikely event of a jury trial, only six or eight citizens typically are empaneled.[7] What some would call cults of judicial management and alternative dispute resolution have arisen, eroding certain aspects of the adversary system and blocking access to the courtroom for a trial on the merits. In short, the world of those who drafted the original Federal Rules largely has disappeared, causing one district judge to remark that the "reality" is that our "system [is] becoming increasingly inaccessible to the average citizen."[8] Sadly, in some respects today's civil litigation is neither civil nor litigation as previously known.

---

7. *See* Fed.R.Civ.P. 48(a) (setting the number of jurors between six and twelve). In Marc Galanter and Angela Frozena, *'A Grin Without a Cat': Civil Trials in the Federal Courts* (May 1, 2010) (unpublished manuscript), available at *http://civilconference.uscourts.gov/ LotusQuickr/dcc/Main.nsf/$defaultview/AD 5073BA32C488C1852577F0038C80/$File/ Marc% 20Galanter% 20and% 20Angela% 20Frozena'% 20A% 20Without% 20a% 20Cat.pdf?OpenElement*, the authors note the percentage and absolute drop in federal court trials over the past quarter century despite the growth in the legal system and conclude "that the civil trial is approaching extinction." *Id.* at 1. *See generally* 9B Wright & Miller § 2491 (3d ed. 2008) (discussing the size of the jury); Marc Galanter, *The Hundred–Year Decline of Trials and the Thirty Years War*, 57 Stan. L. Rev. 1255, 1255 (2005) (stating that "an abundance of data shows that the number of trials—federal and state, civil and criminal,

jury and bench is declining"); William G. Young, *Vanishing Trials, Vanishing Juries, Vanishing Constitution*, 40 Suffolk U. L. Rev. 67, 73 (2006) ("For some time now, circumstances and anecdotal evidence has been mounting that jury trials are, with surprising rapidity, becoming a thing of the past.").

8. *Scheetz v. Bridgestone/Firestone, Inc.*, 152 F.R.D. 628, 630 n. 2 (D.Mont.1993) (quoting Joseph R. Biden, Jr., *Equal, Accessible, Affordable Justice Under Law: The Civil Justice Reform Act of 1990*, 1 Cornell J.L. & Pub. Pol'y 1, 3 (1992) (internal quotation marks omitted)); *see also Dondi Props. Corp. v. Commerce Sav. & Loan Ass'n*, 121 F.R.D. 284, 286 (N.D.Tex.1988) ("[N]or can justice long remain available to deserving litigants if the costs of litigation are fueled unnecessarily to the point of being prohibitive.").

Arthur R. Miller, *From* Conley *to* Twombly *to* Iqbal: *A Double Play on the Federal Rules of Civil Procedure,* 60 Duke L.J. 1, 9–10 (2010) (footnotes in original).

The Supreme Court considers the case management abilities of district court judges "modest" at best. See *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 559, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The Supreme Court's jaundiced view of our abilities is working enormous consequences upon the survival and continued vitality of our citizens' Seventh Amendment right to trial by jury. See Miller, *From* Conley *to* Twombly *to* Iqbal, *supra*; Andrew M. Siegel, *The Court Against the Courts: Hostility to Litigation as an Organizing Theme in the Rehnquist Court's Jurisprudence,* 84 Tex. L. Rev. 1097 (2006) (detailing the Supreme Court's disdain of the trial processes in the federal district courts).

Can we do better?

Perhaps.

With utmost respect, I suggest there are significant reasons of judicial economy to warrant overriding the forum selection clause and retaining jurisdiction over this case. *Cf. Red Bull Assocs. v. Best Western Int'l, Inc.,* 862 F.2d 963 (2d Cir.1988) (refusing a motion to transfer a civil rights action despite the existence of a forum selection clause specifying venue in another district due to a strong federal public policy favoring enforcement of the civil rights laws, which would be frustrated by implementation of the forum selection clause); *In re Ha–Lo Indus., Inc.,* No. 02 B 12059, 2003 WL 1824436 (Bankr.N.D.Ill. Mar. 14, 2003) (declining to transfer the case despite the great weight given to the choice of forum under the valid and enforceable New York forum selection clause, because almost all of the other Section 1404(a) factors weighed strongly against transfer, virtually all of the potential witnesses and documents were located in Illinois, retention would promote judicial economy in light of the several parallel proceedings pending before the court, and all of the relevant events transpired in Illinois).

Neutral principles of judicial economy indicate that this case ought remain in the judicial workload of the District of Massachusetts. Massachusetts has thirteen authorized judges (with one vacancy) [9] while

9. *But see* Report of the Proceedings of the Judicial Conference of the United States 23, March 17, 2009 (advising the President not to fill the vacant seat in the District of Massachusetts). As I have written:

> [F]rom time to time the Judicial Conference takes upon itself the authority to advise the President not to nominate judges to fill vacancies it deems superfluous. It makes this decision by fixing an arbitrary cutoff point based upon the court's "weighted caseload," derived by a methodology that has been sharply (and accurately) criticized by independent observers. While the "weighted caseload" ranking may be modified by various gestalt factors, none of them have anything to do with the actual work being performed by the judges of the affected court, i.e. the on bench and trial time of those judges.
>
> Even putting aside the larger issues of the separation of powers—the fact that the Judi-

cial Conference is, in effect, advising the President not to enforce a law passed by Congress setting the number of district judges within each judicial district and is interfering with the Senate's constitutional prerogative to advise and consent to such nominations-what message does this communication send to the people of the affected district? Can it be that the speed and quality of justice is too high in those locations and we need to cut back? And what of the active judges in such a district, knocking themselves out to try the cases before them and help other courts as well? Each one must know that, should she falter or fail, it is the official policy of the Judicial Conference that her seat shall lie vacant and her courtroom go dark.

William G. Young, *A Lament for What Was Once and Yet Can Be,* 32 B.C. Int'l. & Comp. L. Rev. 305, 317–18 n. 72 (2009) (citations omitted).

Delaware has four authorized judges (with one vacancy).[10] *Admin. Office of the U.S. Dist. Courts*, 2010 Federal Court Management Statistics, 38, 55 [hereinafter "Statistics"]. Both Delaware and Massachusetts are extraordinarily productive district courts. Using the most comprehensive figures available—the period ending September 30, 2009—Massachusetts and Delaware, out of all ninety-four district courts, rank fourth and fifth respectively in numbers of civil cases tried per judge. Appendix A (ranking the top twenty-five United States District Courts on this important measure of productivity). The average active district judge in the United States today tries only five civil cases per year. Her counterpart in Massachusetts tries 9.1 civil cases and, in Delaware, nine such cases.[11] Thus the District Courts of Delaware and Massachusetts are roughly comparable in their proactive management of civil cases for trial. Unfortunately, perhaps owing to the extraordinary complexity of the corporate and patent cases that dominate Delaware's civil caseload, each active Delaware district judge has an average of 53 pending civil cases over three years old while the counterpart judge in Massachusetts has only fourteen such cases.[12] For this reason alone, the most efficient and least costly forum to manage this case, and thus to secure the goal of "just, speedy, and inexpensive" case resolution as mandated by the Federal Rules of Civil Procedure, is Massachusetts.

## IV. CONCLUSION

Accordingly, Ganguly Trust and Ventures' motion to dismiss for lack of personal jurisdiction is DENIED. This Court rules that the forum selection provision is mandatory, binding and enforceable. Even so, rather than dismissing the case for failure to state a claim upon which relief can be granted, this Court, in the interest of justice, will continue to exercise jurisdiction over the case pursuant to 28 U.S.C. § 1404(a).

SO ORDERED.

## APPENDIX A

**10.** In Delaware, however, it appears that the Judicial Conference is, rather officiously, advising the President to nominate an individual to fill that vacancy.

**11.** This Court is well aware that the 2010 Federal Court Management Statistics report, under "Actions per Judgeship—Trials Completed," that each active judge in the District of Delaware completed twenty-three "trials," see Statistics, *supra*, at 55, and each such judge in Massachusetts completed fourteen "trials," *see Id.* at 38. Unfortunately, these figures do not reflect reality.

[As reported in the publicly accessible Federal Court Management Statistics, the Judicial] Conference has debased the term "trial." The term once denoted a jury or bench proceeding that led to a verdict; now it encompasses any disputed evidentiary

hearing. Thus a criminal case with a motion to suppress, a *Daubert* hearing, a genuine trial, and a sentencing hearing counts as four "trials," as does a civil patent case with a preliminary injunction hearing, a *Markman* hearing, a genuine trial, and a separate damages hearing. As a result, the Administrative Office inflates the actual number of trials by approximately 33%. However much this may impress Congress, such imprecision renders the term "trial" essentially meaningless, a result not lost on scholars and the knowledgeable press.

Young, *supra* note 9, at 317 (footnotes omitted).

**12.** Nationwide, the average is 65.5 such old cases per active district judge. Statistics, *supra* at 167 (44,447 cases over three years old divided by 678 active district judges).

TABLE C 4A  U.S. DISTRICT COURTS - MODIFIED
CIVIL CASES TERMINATED, BY DISTRICT AND ACTION TAKEN
(LAND CONDEMNATION CASES OMITTED)
DURING THE TWELVE MONTH PERIOD ENDED SEP. 30, 2009

| CIRCUIT AND DISTRICT | AUTHORIZED JUDGESHIPS | TOTAL | NO COURT ACTION | COURT ACTION TOTAL | BEFORE PRETRIAL | DURING OR AFTER PRETRIAL | DURING OR AFTER TRIAL TOTAL | NON-JURY | JURY | PERCENT REACHING TRIAL | AVERAGE # OF TRIALS PER JUDGESHIP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL... | 678 | 263,049 | 54,840 | 208,209 | 181,111 | 23,827 | 3,271 | 997 | 2,274 | 1.2 | 4.8 |
| AR,E.... | 5 | 2,255 | 474 | 1,781 | 1,718 | 8 | 55 | 22 | 33 | 2.4 | 11.0 |
| CA,E.... | 6 | 5,306 | 1,887 | 3,419 | 3,338 | 20 | 61 | 9 | 52 | 1.1 | 10.2 |
| MS,N.... | 3 | 919 | 238 | 681 | 498 | 153 | 30 | 6 | 24 | 3.3 | 10.0 |
| MA...... | 13 | 2,818 | 426 | 2,392 | 2,019 | 255 | 118 | 41 | 77 | 4.2 | 9.1 |
| DE...... | 4 | 1,048 | 168 | 880 | 834 | 10 | 36 | 8 | 28 | 3.4 | 9.0 |
| OR...... | 6 | 2,219 | 591 | 1,628 | 1,566 | 8 | 54 | 13 | 41 | 2.4 | 9.0 |
| TN,M.... | 4 | 1,401 | 316 | 1,085 | 1,044 | 6 | 35 | 6 | 29 | 2.5 | 8.8 |
| WI,W.... | 2 | 757 | 103 | 654 | 412 | 226 | 16 | 3 | 13 | 2.1 | 8.0 |
| IA,S.... | 3 | 834 | 150 | 684 | 553 | 107 | 24 | 11 | 13 | 2.9 | 8.0 |
| IL,C.... | 4 | 1,082 | 404 | 678 | 641 | 6 | 31 | 6 | 25 | 2.9 | 7.8 |
| PA,M.... | 6 | 2,358 | 708 | 1,650 | 1,542 | 63 | 45 | 11 | 34 | 1.9 | 7.5 |
| MS,S.... | 6 | 3,202 | 1,861 | 1,341 | 1,245 | 51 | 45 | 17 | 28 | 1.4 | 7.5 |
| NY,N.... | 5 | 1,548 | 446 | 1,102 | 771 | 294 | 37 | 9 | 28 | 2.4 | 7.4 |
| NE...... | 3 | 721 | 37 | 684 | 643 | 19 | 22 | 10 | 12 | 3.1 | 7.3 |
| AL,M.... | 3 | 1,183 | 338 | 845 | 770 | 53 | 22 | 4 | 18 | 1.9 | 7.3 |
| NY,W.... | 4 | 1,690 | 197 | 1,493 | 1,360 | 104 | 29 | 8 | 21 | 1.7 | 7.3 |
| TX,E.... | 8 | 2,867 | 819 | 2,048 | 1,944 | 46 | 58 | 6 | 52 | 2.0 | 7.3 |
| FL,N.... | 4 | 1,688 | 88 | 1,600 | 1,555 | 16 | 29 | 8 | 21 | 1.7 | 7.3 |
| CT...... | 8 | 2,219 | 1,384 | 835 | 715 | 63 | 57 | 13 | 44 | 2.6 | 7.1 |
| IL,S.... | 4 | 1,029 | 351 | 678 | 629 | 21 | 28 | 8 | 20 | 2.7 | 7.0 |
| AR,W.... | 3 | 773 | 50 | 723 | 701 | 1 | 27 | 6 | 15 | 2.7 | 7.0 |
| MI,W.... | 4 | 1,596 | 181 | 1,415 | 1,366 | 22 | 27 | 10 | 17 | 1.7 | 6.8 |
| CO...... | 7 | 3,074 | 225 | 2,849 | 2,721 | 84 | 44 | 11 | 33 | 1.4 | 6.3 |
| PR...... | 7 | 1,462 | 292 | 1,170 | 935 | 192 | 43 | 6 | 37 | 2.9 | 6.1 |
| LA,E.... | 12 | 7,757 | 112 | 7,645 | 4,906 | 2,669 | 70 | 34 | 36 | 0.9 | 5.8 |